JOINER, Judge.
Michael Bragg Woolf was convicted of two counts of capital murder for killing his wife, Angel Marie Woolf, and their two-year-old son Charles Ayden Woolf (“Ay-den”). See § 13A-5-40(a)(10), Ala.Code 1975 (making capital the killing of two or more persons by one act or pursuant to one scheme or course of conduct), and § 13A-5-40(a)(15), Ala.Code 1975 (making capital the killing when the victim is less than 14 years of age). The jury, by a vote of 11 to 1, recommended that Woolf be sentenced to death. The circuit court followed the jury’s recommendation and sentenced Woolf to death. Woolf appeals.
The evidence at trial tended to demonstrate the following. On February 15, 2008, Woolf went to Resultz Corp. in Mobile with his wife Angel, their two-year-old son Ayden, and Woolfs mother, Lynn Tul- *346 los. Woolf and Angel had what witnesses described as a turbulent relationship, and, because Woolf had begun to doubt that he was Ayden’s biological father, Woolf and Angel went to Resultz Corp., “a biomedical testing laboratory” that performed drug screenings and “DNA collections and testing,” for a paternity test to determine whether Woolf was Ayden’s biological father. Woolf seemed stressed about the results of the test and said “that other people were saying [Ayden] [might] not be his.”. After completing the test, Woolf asked an employee of Resultz Corp. to pray for him.
After he received the results, Woolf returned to Resultz Corp. with Ayden on March 3, 2008. Woolf told a Resultz Corp. employee that he needed to have the results of the test “explained] to him because he was a little confused about [them]."[1] The employee explained the results to Woolf who said “he was just worried about” what other people were saying regarding Ayden’s paternity. As Woolf left Resultz Corp., he asked the owner whether she believed in God and asked her to pray for him.
Shortly after midnight on the morning of March 5, 2008, Woolf called the Mobile County emergency 911 number and reported that he had killed his family and needed to go to jail. Paramedics with the Mobile Fire Department and officers with the Mobile Police Department were dispatched to Woolfs mobile home.
At 1:05 a.m., Jonathan Parker and Coye Lucky, paramedics with the Mobile Fire Department, were parked in a rescue truck at a Circle K store located at the corner of Schillingers Road and Moffett Road waiting to be told when they could safely enter Woolfs mobile home. Woolf, after parking his car in front of the rescue truck at the Circle K, got out of his car and approached the rescue truck. Parker got out of the truck and walked toward Woolf, who said, “You need to call the cops.” When Parker asked him if he had shot his family, Woolf “said that [his] son came into the room and said pow-pow and then [he] heard two gunshots, [he] blacked out and [he] left.” Woolf started to leave, but the paramedics told him not to.
Officer Shannon Payne of the Mobile Police Department, who was responding to the call to Woolfs mobile home, stopped at the Circle K when she saw the paramedics. As Officer Payne got out of her patrol car, Woolf approached her with “his hands ... facing out ... with his palms facing almost as if they were going to be in a handcuffed position.” Woolf said, “I poisoned my wife and put me in handcuffs.” As Officer Payne was placing Woolf inside her patrol car he said, “I heard two noises pow-pow, then I blacked out.” (R. 1373.)
Corporal ■ Brian Reeher of the Mobile Police Department arrived at the Circle K, and he and Officer Payne transferred Woolf to Cpl. Reeher’s patrol car.[2] ■ As Cpl. Reeher placed Woolf in his patrol car, Woolf said, “My wife poisoned me.” Cpl. Reeher also heard Woolf say that Woolfs “wife made me do it.” Officer Payne later checked on Woolf who said, “I may have actually done it.” Officer Payne asked Woolf what he may have actually done, and he said, “I might have gotten a gun.”
Angela Prine, an investigator with the Mobile Police Department, arrived at the Circle K store and got in the backseat of *347 Cpl. Reeher’s patrol car with Woolf. Prine read Woolf his Miranda[3] rights and briefly interviewed him to get personal information about Angel and Ayden.
Mobile police officers went to Woolfs mobile home, where they found the bodies of Angel and Ayden; both Angel and Ay-den had been shot. The officers also, located a “sock print impression that was in blood” and several bloody shoe impressions. On the living-room floor officers found a .38 caliber revolver that held two spent casings and one cartridge.
Officers transported Woolf to the Mobile Police Department headquarters' and placed him in an interview room. Officer Payne checked on Woolf, who was alternating between pacing and lying on the floor. Woolf said, “Pm a fucking dumb ass.” He also said, “Shoot me, just shoot me.” (R. 1415.) When Officer Payne asked why he should shoot him, Woolf said, “because I’m guilty.” (R. 1415.) Investigator Prine arrived at police headquarters and again advised Woolf of his Miranda rights. Woolf did not sign the waiver-of-rights form, but he did speak with Prine and Cpl. Jeremy March.
Following his conversation with Prine and Cpl. March, Woolf was placed under arrest. As he got undressed to change into a white jail jumpsuit, Woolf pulled off á sock that appeared bloody, “kind of wadded it and touched it to his mouth and kissed it and said, ‘oh, my baby.’ ”
' An autopsy revealed that the cause of Angel’s death was a “gunshot wound to the face.” The autopsy performed on Ayden revealed that he also “died as a result of a gunshot wound to the face.” (R. 1717.)
Woolf called several witnesses to' testify during the guilt phase of the trial. Two friends testified about seeing Woolf, Angel, and Ayden interact with each other. ~ A lieutenant with the Mobile Police Department testified that he saw no evidence indicating that Angel and Ayden received any medical assistance on the night of the shooting. Woolf called Lucky, who testified about the events that occurred in the Circle K parking lot and stated that neither he nor Parker entered the mobile home that morning.
Woolf called three Mobile police officers, two of whom told the jury about the actions law-enforcement personnel had taken as they approached, entered, and searched Woolfs mobile home on .the morning of March 5, 2008, The third officer testified about securing Woolfs car at the Circle K store and assisting in a search of that car.
Three of Woolfs neighbors testified on his behalf. One neighbor .testified about her interaction with the officers on the morning of March 5, 2008, and stated that after the officers left the trailer park she noticed that skirting had been removed from around the base of her trailer. Another neighbor testified that Woolf, Angel, and Ayden “seemed like a really happy family.” The last neighbor testified about her interactions with the Woolf family.
Woolf testified in his own behalf. He told the jury that he “knew Ayden was [his but he] just wanted the paper [with the DNA test results].” Woolf further said that he did not understand the DNA results and decided' to go back to Resultz Corp. to have the results explained to him.
Woolf also testified that he and a- friend went riding around on March 4, 2008. When he returned home, he said, Angel confronted him about him having been away from home; He left again, this time by himself. While riding around, Woolf said, he smoked marijuana, “took two Dar-vocets and drank five or six beers.” When *348 he returned home, he took the gun inside the mobile home with him. Angel confronted him and grabbed his arm. Woolf said he pulled away from Angel and shot the gun behind him to scare her. Angel “screamed and said, ‘You shot Ayden.’” (R. 1902.) After Woolf saw that Ayden had been shot, he shot Angel. Woolf called emergency 911 and left the mobile home, stopping when he saw the emergency responders at the Circle K store.
Woolf presented a psychologist who testified about his evaluation of Woolf and Woolfs interactions with law enforcement after the shooting.
The circuit court charged the jury, and the jury returned a guilty verdict on both counts of the indictment. At the conclusion of the penalty phase of the trial, the jury recommended the death sentence by an 11-1 vote. Following the sentencing hearing, the circuit court sentenced Woolf to death.

Standard of Review

Because Woolf has been sentenced to death, we apply the standard of review set out in Rule 45A, Ala. R.App. P., which requires that,
“[i]n all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.”
The Alabama Supreme Court has explained:
“1 “To rise to the level of plain error, the claimed error must not only seriously affect a defendant’s ‘substantial rights,’ but it must also have an unfair prejudicial impact on the jury’s deliberations.”’ Ex parte Bryant, 951 So.2d 724, 727 (Ala.2002) (quoting Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App. 1998)). In United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the United States Supreme Court, construing the federal plain-error rule, stated:
‘“The Rule authorizes the Courts of Appeals to correct only “particularly egregious errors,” United States v. Frady, 456 U.S. 152, 163 (1982), those errors that “seriously affect the fairness, integrity or public reputation of judicial proceedings,” United States v. Atkinson, 297 U.S. [157], at 160 [ (1936) ]. In other words, the plain-error exception to the contemporaneous-objection rule is to be “used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.” United States v. Frady, 456 U.S., at 163, n. 14.’
“See also Ex parte Hodges, 856 So.2d 936, 947-48 (Ala.2003) (recognizing that plain error exists only if failure to recognize the error would ‘seriously affect the fairness or integrity of the judicial proceedings,’ and that the plain-error doctrine is to be ‘used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result’ (internal quotation marks omitted)).”
Ex parte Brown, 11 So.3d 933, 938 (Ala. 2008).
“The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal.” Hall v. State, 820 So.2d 113, 121 (Ala.Crim.App. 1999). Although “the failure to object will not bar our review of any issues [Woolf] raises on appeal, it will weigh against -any *349 claim of prejudice that [Woolf] makes on appeal.” Thompson v. State, 153 So.3d 84, 103 (Ala.Crim.App.2012) (citing Brooks v. State, 973 So.2d 380, 387 (Ala.Crim.App. 2007)).

Guilt-Phase Issues

I.
Woolf contends that “[t]he trial court committed reversible error by admitting inculpatory statements obtained from Mr. Woolf in violation of his Fifth Amendment privilege against self-incrimination and his Fourteenth Amendment right to due process.” (Woolfs brief, p. 75.)
Before trial, Woolf filed a motion to suppress the statements he made “to law enforcement and or agents of law enforcement.” (C. 172.) The circuit court conducted a hearing before granting the motion in part and denying it in part. The circuit court granted the motion regarding statements made by Woolf during the interview conducted in the police interrogation room after Woolf had indicated that he wanted an attorney.
“ ‘ “This Court reviews de novo a circuit court’s decision on a motion to suppress evidence when the facts are not in dispute. See State v. Hill, 690 So.2d 1201, 1203 (Ala.1996); State v. Otwell, 733 So.2d 950, 952 (Ala.Crim.App. 1999).” ’ State v. C.B.D., 71 So.3d 717, 718 (Ala.Crim.App.2009) (quoting State v. Skaggs, 903 So.2d 180, 181 (Ala.Crim. App.2004)).
“ As our Supreme Court has stated:
‘““The Fifth Amendment to the United States Constitution provides that ‘[n]o person ,.. shall be compelled in any criminal case to be a witness against himself.’ U.S. Const. Amend. V. In Miranda [v. Arizona, 384 U.S. 436 (1966)], the United States Supreme Court held that the right against self-incrimination ‘is fully applicable during a period of custodial interrogation.’ 384 U.S. at 460. The Supreme Court in Miranda further held that ‘the right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege....’ 384 U.S. at 469. Before a custodial interrogation, a suspect must be informed of these rights, now commonly referred to as Miranda rights. 384 U.S. at 444 (‘Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.’). The Supreme Court in Miranda recognized that ‘the defendant may waive effectuation of these rights, provided that the waiver is made voluntarily, knowingly, and intelligently.’ Id.” ’ ”
Ward v. State, 105 So.3d 449, 452-53 (Ala.Crim.App.2012) (quoting Thompson v. State, 97 So.3d 800, 805 (Ala.Crim.App. 2011), quoting in turn Ex parte Landrum, 57 So.3d 77, 81 (Ala.2010)). “To decide if a suspect is in custody, the court, looking at the totality of the circumstances, must find that a reasonable person in the suspect’s position would believe that he or she is not free to leave.” Seagroves v. State, 726 So.2d 738, 742 (Ala.Crim.App.1998).
With these principles in mind, we address Woolfs claims.
A.
Woolf first challenges the statements he made to Mobile Fire Department paramedic Jonathan Parker at the Circle K store. When Parker saw Woolf get out of his car, Parker got out of his rescue truck and walked up to him. Woolf said, “You need to call the cops.” (R. 1354.) *350 Parker asked Woolf if he had just shot his family, and Woolf said, “I don’t know.” (R, 1355.) When Parker asked for clarification, Woolf told him that Ayden had come “into the room and said pow-pow and then [Woolf] heard two gunshots, ... blacked out and .., left.” (R. 1355.) When Woolf said that he had to leave, Parker said, “No, you don’t; you’re not going anywhere.” (R. 1355.) Woolf argues that he was detained when Parker told Woolf that he did not need to leave the Circle K.
The record demonstrates, however, that Woolf was not in custody when he spoke with Parker. Two Mobile Fire Department vehicles were at the Circle K that morning; one was a fire engine and the other was a rescue unit. Woolfs first statement to Parker, that he “needed to call the cops,” indicates that Woolf knew he was not speaking with a law-enforcement officer. (R. 1354.) Additionally, Woolf attempted to leave the scene after he had made the statements he argues should have been suppressed. The totality of the circumstances would not have caused a reasonable person in Woolfs position to believe that he was not free to leave; indeed, Woolfs attempted departure at that time indicates that even Woolf did not believe that he was being detained. Accordingly, because he was not in custody at the time Woolf spoke with Parker, the admission of the statements he made to him did not violate Miranda.
B.
Woolf next asserts that the circuit court erroneously admitted the statements he made to law enforcement on March 5, 2008.
1.
While still in the Circle K parking lot, Woolf made statements directly to, or in the presence of, law-enforcement officers.
a.
When Shannon Payne, a patrol officer with the Mobile Police Department, stopped at the Circle K store, Woolf walked up to her with “his hands ... facing out ... with his palms facing almost as if they were going to be in a handcuffed position.” (R. 1372.) Woolf said, “I poisoned my wife and put me in handcuffs.” (R. 1372.) As Officer Payne was placing Woolf inside -her patrol car he said, “I heard two noises pow-pow, then I blacked out.” (R. 1373.) Neither of those statements was in response to any questions asked of Woolf.
After Cpl. Brian Reeher of the Mobile Police Department arrived at the Circle K, Woolf was placed in Cpl. Reeher’s patrol car. As Cpl. Reeher was placing Woolf in his patrol car, Woolf said, “My wife poisoned me.” (R. 1413.) While Woolf was in the patrol car, Cpl. Reeher heard Woolf say that Woolfs “wife made [him] do it.”[4] (R. 1414.) Officer Payne later opened the door to check on Woolf, and Woolf stated, “I may have actually done it.” (R, 1375.) In response, Officer Payne asked what Woolf may have actually done, and Woolf said, “I might have gotten a gun.” (R. 1375.)
“‘“‘“If the defendant spontaneously volunteers information, either before or after being given the Miranda warnings, those statements need not be suppressed.” United States v. Edwards, 885 F.2d 377, 387 (7th Cir.1989). See also Crawford v. State, 479 So.2d 1349, 1352 (Ala.Cr.App.1985) (“An unsolicited remark, not in response to any interrogation, does not fall within the Miranda *351 rule.”); United States v. Lawrence, 952 F.2d 1034, 1036 (8th Cir.[1992]) (“The protections afforded a suspect under [Miranda ] apply only when the suspect is both in custody and being interrogated. A voluntary statement made by a suspect, not in response to interrogation, is not barred by the Fifth Amendment and is admissible with or without the giving of Miranda warnings,”), cert. denied, 503 U.S. 1011, 112 S.Ct. 1777, 118 L.Ed.2d 434 (1992).
““““Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated.... Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by [the holding in Miranda ].”
“ ‘ “ Miranda v. Arizona, 384 U.S. 436, 478, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966). See also Britton v. State, 631 So.2d 1073, 1078 (Ala.Cr.App.1993); Williams v. State, 601 So.2d 1062, 1072 (Ala.Cr.App.1991).’ ” ’ ”
Brown v. State, 982 So.2d 565, 601-02 (Ala.Crim.App.2006) (quoting Maples v. State, 758 So.2d 1, 42-43 (Ala.Crim.App.1999) (additional citations omitted)).
Except for his reply to Officer Payne’s question regarding what he might have done, all the statements Woolf made to Officer Payne and Cpl. Reeher were voluntary statements not made in response to custodial interrogation, and their admission was not error. Likewise, Woolfs reply to Officer Payne’s question regarding what he might have done was not admitted in error; law-enforcement officers may, without offending Miranda, ask a question to clarify a statement made by a suspect. See, e.g., Andersen v. Thieret, 903 F.2d 526, 532 (7th Cir.1990).
b.
Investigator Angela Prine with the Mobile Police Department arrived at the Circle K store and got in the back-seat of Cpl. Reeher’s patrol car with Woolf. Investigator Prine read Woolf his Miranda rights and asked him if he understood that he could “decide at any time to exercise these rights and not answer any questions or make any statements.” (C. 326.) Woolf replied, “I will but I shouldn’t do it right now.” (C. 326.) Investigator Prine then briefly interviewed Woolf regarding his medications and personal information about Angel and Ayden.
The United States Court of Appeals for the Eleventh Circuit has recognized that “a waiver of rights can be implied from the actions and words of the person being questioned.” United States v. Boon San Chong, 829 F.2d 1572, 1574 (11th Cir.1987). State’s Exhibit 40, the recording of the interview Investigator Prine conducted of Woolf in the patrol car, demonstrates that Woolf implicitly but voluntarily, knowingly, and intelligently waived his Miranda rights before speaking with Investigator Prine.
'2.
Woolf also challenges the admission of statements he made while at the Mobile Police Department headquarters.
a.
Officers from the Mobile Police Department transported Woolf from the Circle K store to police headquarters and, once there, placed him in an interrogation room. Officer Payne checked on Woolf, who was alternatively pacing and lying on the floor. Woolf said, “I’m a fucking dumb *352 ass.” (R. 1376.) He also said, “shoot me, just shoot me.” (R. 1415.) When Officer Payne asked why, Woolf said, “because I’m guilty.” (R. 1415.)
The admission of the first two statements Woolf made to Officer Payne was not erroneous because they were voluntary statements not made in response to custodial interrogation. See Brown v. State, 982 So.2d 565, 601-02 (Ala.Crim.App.2006). Officer Payne’s question seeking to clarify why Woolf told Officer Payne to shoot him did not offend Miranda, and Woolfs response was properly admitted. See, e.g., Andersen v. Thieret, 903 F.2d 526, 532 (7th Cir.1990).
b.
Investigator Prine arrived at police headquarters and, with Cpl. Jeremy March present, spoke with Woolf. At the beginning of that conversation, the following occurred:
“MARCH: Come over here for me, she’s going to sit right here and talk to you.
“WOOLF: I don’t want to try and breathe on y’all man cause I’m coughing up some brown phlegm and stuff. Uhhh.
“PRINE: Alright, Mike, you want a soda or something?
‘WOOLF: Huh?
“PRINE: I said is that water fine?
“WOOLF: Yes it is.
“PRINE: Would you like a soda or something?
“WOOLF: No I’m good.
“PRINE: That good?
WOOLF: I need constant fluid but.
“PRINE: Uh-huh.
WOOLF: I just feel like, I don’t know I just feel real irritable and stuff I don’t know what’s going on.
“PRINE: Ok. Alright.
“WOOLF: I know I’m in freaking trouble. I don’t know, man, I just feel like I want to go crazy but I don’t want to. I don’t know what I want to do.
“MARCH: We’re going to try and figure it out, ok.
WOOLF: I can’t help it cause I’m so tired, I ain’t slept man, I can’t even think. I can’t even think. I just want to take a nap. (Making a whining sound). Ahhhh. All I can say is I’m fucking guilty man, I don’t know. Please do whatever y’all got to do.”
(C. 329.)
After Investigator Prine read Woolf his Miranda rights, the following exchange occurred:
“PRINE: We’re going over the next part with you, ok. It says, it’s your Waiver Part: ‘I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or force of any kind has been used against me. I hereby voluntarily and intentionally waive my rights and am willing to make a statement and answer questions.’ You want to tell us what happened earlier? You want to talk to me?
WOOLF: I mean I do.
“MARCH: It might make you feel better.
“WOOLF: How, how did you see it?
“MARCH: It might help you to get it out of your system. You don’t need to hold this in.
“PRINE: And you want us to know what happened, right?
“WOOLF: I’m afraid there’s cameras on me at the house, the TV was talking to me, I feel like (inaudible), I’m feeling all kind of crazy shit. I don’t know. Me and my wife has been having problems for nearly 2 years. I don’t, I don’t know *353 what’s wrong. I just want to sleep. I just.
“PRINE: Ok. Listen to me.
“WOOLF: A little while.
“PRINE: You want to tell me what happened sign right here for me, ok.
“WOOLF: I will tell you.”
(C. 330-31.)
Although Woolf did not sign the waiver-of-rights form, the interview continued until the following occurred:
“WOOLF: I don’t remember. I can’t even think right now, sir. I don’t know, I went, I guess I’m guilty. I want a lawyer. I don’t know what to say. Ohhhhh. I just know I’ve been up, I’m been pacing around my house for days, I ain’t even on drugs. I don’t know it’s like my own mind, I do not know. I do not know. I mean I don’t know why I do the things I do. I just can’t explain right now. Uhhhh. I just can’t sleep y’all please. I can’t even sign the form now. I just want to go to sleep. Uhhhhh.
“PRINE: Ok, listen here, Mike, do you want a lawyer or do you want to talk to us?
“WOOLF: I need a lawyer present I guess. I mean if, I mean I don’t know.
“PRINE: Well you know what you want to do.
“WOOLF: I’m guilty. If there’s a camera I am guilty. I just can’t explain right now. Please. I would remember everything I’m sure. Uhhhh.”
(C. 332.)
After offering Woolf something else to drink, Cpl. March and Investigator Prine left Woolf alone in the interrogation room. During this time, Woolf said the following:
“I mean I just got to lay down just, that’s all I want to do. Ohhhhh. Ohhhh. I can’t even think now Ayden, oh Ayden. Uhhhh. Ohhhhh, ohhhhh. It keeps going through my head but I don’t want to dream either. I want to see my son. (Crying sounds). Ahhhhh, ahhhhh. Oh God. Ghhhhhhh. I wish I was dead with you. (Crying sounds). Ahhhhh. Ahhhhh. ' Errrr. Ahhhhhh. Uhh man what did you do? (Crying sounds) Ahhhhh. I can’t fucking breathe. Uh is there any tissue. Ahhh I just want to sleep. Ahhh (making crying sounds). God this floor is freezing. Ohhhhh. Ohhh God please, oh please, please, please. I want to cry, I want to cry.”
(C. 332 (as transcribed).)
Investigator Prine returned with water, spoke with Woolf about his tattoos, and looked at his shoes before leaving. again. While alone this time, Woolf called out for some tissue. Cpl. March brought the tissue and left. Woolf then made the following comments:
“Ohhhh. Oh man. Thank you. Ahhhhh. Ohhhh. Don’t put that there. Ohhh. (Inaudible), (inaudible), (inaudible). Ohhhh. Ohhhhh. Ohhhh. Ohhh. Whew. Ohhhh. Ummmm. Ohhhh. Ohhhh. Ohhhh. Ohhhh. Ohhhh. Man I’m in some shit man, I fucked up. (Inaudible). Ummmm. I need some .sleep. Ohhhhh. Man. Ohhhhh. (Inaudible). Oh man I want to lay down. Uhhhh. Uhhhhh. I didn’t mean it oh shit. Ahhhhh, (Inaudible) man. Whew, oh God what did I do. I don’t want to think right now. Please, put me in a fucking locked room. Uhhhhh. Ouuuuu God, uhhhhhh, uhhhhhh. Ohhh please Jesus. Just let me sleep (inaudible) kill (inaudible) baby. (Inaudible). Please. Uhhhhh, I love you, uhhhhh, ohhhhhhh (making sounds), I love you, I love you. Uhhhhhhh, uhhhhh, Ohhhhh. They need to turn these lights off or something please. I want it dark for a *354 month. Ohhhhh, ohhhh God. Man. Ohhhhh. I didn’t mean it. Ohhhhhh. Ohhhhh. Ohhhhh. Ohhhhh. (Inaudible), can’t even breathe. I can’t even breathe. I can’t breathe. Ohhhhhh. Oh shit man. Ohhhh. (inaudible). Oh God what’s taking so ■ long. Oooh, uhhhh, uhhhhh. Uhhhh. Man what’s uhhhhhh. Man, uhhhhh I Uhhhh. Uhhhh I just want to go to sleep man. (inaudible) I just want to go to sleep. It’s a fucking dream, damn it I don’t want to see it uhhhh. Uhhhhh. Uhhhhh. Uhhhh. Uhhhh. Ohhhhh. Ohhhh. Ohhhh. (inaudible). Uhhhh. (making sounds), Man, God please please. I don’t want to be here, please, please, please. Uhhh I just wanna. Ohhhh. Ohhhhh. I’m, a fucking pass out man. Uhhhh. Ohhh god what’s the ... Uhhhh. Uhhh. I’ve got to piss again. Man this is just a fucking nightmare. Uhhh. Uhhh. Uhhh.”
(C. 333 (as transcribed).)
Investigator Prine returned and asked Woolf about his height, weight, and place of employment.
The statements Woolf made before Investigator Prine advised him of his Miranda rights were not in response to custodial interrogation. The circuit court did not commit error by admitting them at trial. By stating that he would tell Investigator Prine what had happened and then answering her questions, Woolf again implicitly waived his Miranda rights. The recording of that conversation (State’s Exhibit 43) demonstrates that his waiver was voluntary, knowing, and intelligent. The admission of evidence regarding this conversation was not error.
C.
Woolf contends that all the statements he made that night should have been suppressed because, he says, he was intoxicated and suffering from “multiple mental disorders and pronounced emotional distress.” (Woolfs brief, p. 85.) He also asserts that the interrogations were coercive because of his exhaustion.
“ ‘[A]lleged fatigue is only a factor to be considered by the jury in determining whether it finds a statement to be involuntary. In Jackson v. State, 674 So.2d 1318, 1326-28 (Ala.Cr.App.1993), aff'd in pertinent part, reversed in part, 674 So.2d 1365 (Ala.1994), on return to remand, 674 So.2d 1370 (Ala.Cr.App.1995), the appellant claimed that his statement was involuntary because “he had not slept since the previous night, and the officers continued to interrogate him, despite what he describes as his state of sleep deprivation.” Id., at 1327. In Jackson, this Court stated that the record did indicate that there was testimony from investigating officers that the appellant appeared “sleepy or fatigued,” and the appellant had stated, during his questioning, that he was tired; however, there was no indication that the appellant ever requested that the questioning cease because of his condition. At the close of the appellant’s statement in Jackson, the record indicated that the officers asked if they had “hurt him in any way,” and the appellant responded, “ Tes, y’aJl not letting me go to sleep, man. I’m tired, man. I was up all f-nightId., at 1327. In holding that this condition of sleepiness or fatigue constituted but one factor to be considered by the jury, this Court stated:
“ ‘This claim is also to be considered by the jury in determining the credibility and weight to accord the statement under the totality of the circumstances. This court has found that where a defendant alleged that his statement was involuntary because, among other reasons, *355 he was deprived of food and drink and “was in poor condition physically due to lack of sleep- and the consumption of alcohol and drugs,” this court found that upon a consideration of the totality of the circumstances, the appellant’s statement was voluntary. Callahan v. State, 557 So.2d 1292, 1298-99 (Ala.Cr.App.), affirmed, 557 So.2d 1311 (Ala.1989). Furthermore, the Alabama Supreme Court refused to accept as a “coercive factor” the fact that a juvenile defendant was not questioned until a late hour. Ex parte Smith, 611 So.2d 1023 (Ala. 1992).’ ”
Doster v. State, 72 So.3d 50, 78 (Ala.Crim.App.2010) (quoting Grayson v. State, 824 So.2d 804, 832-33 (Ala.Crim.App.1999)).
1.
Woolfs contention that he was intoxicated when he made inculpatory statements to. firemedics and law-enforcement personnel is without merit.
Officer Payne testified that she smelled no alcohol on Woolf. She specifically stated that she “wouldn’t have arrested him at that point without further investigation for public intoxication].” (R. 89.) Officer Payne also testified that she smelled no marijuana on Woolf and “didn’t believe that he was drunk or on any drugs” at the time of her interaction with him. (R. 1410.) Cpl. Réeher similarly testified that he did not recall that Woolf “appeared] to be under the influence or anything.” (R. 1413.)
Although Woolf directs our attention to his trial testimony that he had been “[s]moking weed” and that he “took two Darvocets and drank five or six beers” while riding around in Baldwin County before returning home on March 4, 2008, the evidence was not clear regarding the time he allegedly consumed these substances or what, if any, affect they still had on him during his interaction with law enforcement on March 5, 2008. (R. 1893.) The trial court did not abuse its discretion in determining, based on the totality of the circumstances, that Woolf was not intoxicated when he waived his Miranda rights and that his waivers were voluntary. See, e.g., Rogers v. State, 365 So.2d 322, 334 (Ala.Crim.App.1978) (“Where, ample evidence, even though conflicting, exists from which the trial judge could conclude that the appellant was not intoxicated to the extent of mania, the admission of a confession for a jury’s consideration is not an abuse of discretion.”),
2.
Woolf also asserts that he was unable to voluntarily make statements and waive his Miranda rights because, he says, he was suffering from emotional distress.
“ ‘Mere emotionalism and confusion do not dictate a finding of mental incompetency or insanity’ so as to render a statement inadmissible.” Callahan v. State, 557 So.2d 1292, 1300 (Ala.Crim.App. 1989) (quoting Sullivan v. Alabama, 666 F.2d 478, 483 (11th Cir.1982)). “An accused’s mental and emotional state is but one factor to be considered when reviewing the totality of the circumstances surrounding an extrajudicial statement.” Minor v. State, 914 So.2d 372, 390 (Ala,Crim. App.2004).
Cpl, Reeher testified that he believed Woolf “appeared emotionally distraught. And I’m not saying in a highly agitated way. I’m saying in a sense he was — it seemed more like he was upset due to the circumstances.” (R. 101.) Officer Payne stated that Woolf acted “just very odd that evening.” (R. 86.)
Although Woolf may have been emotionally distraught after having just shot his wife and child, that fact does not require a finding that his waivers and statements *356 were involuntary. Under the totality of the circumstances, the admission of the statements was proper..
3.
Finally, Woolf argues that because of his exhaustion, the interrogations were coercive. However, “whether a defendant was physically exhausted when he gave his statement is merely one factor to be considered by the jury in determining the credibility and weight to afford the statement.” Waldrop v. State, 859 So.2d 1138, 1158-59 (Ala.Crim.App.2000) (citing Burgess v. State, 723 So.2d 742 (Ala.Crim. App.1997)). Although alleged fatigue is one factor to be considered by a jury when determining the voluntariness of a statement, the totality of the circumstances demonstrate that Woolfs statements and waivers were voluntary.
II.
Woolf asserts that he “was denied his right to a fair and impartial jury when a qualified prospective juror was improperly excused based on his views on the death penalty even though he stated he could follow the law.” (Woolfs brief, p. 104.) Woolf refers to Juror no. 23, who indicated that he did not believe that he should decide whether someone received the death penalty.
In his questionnaire, Juror no. 23 checked a box indicating that even though he “[did] not believe that the death penalty should ever be assessed, as long as the law provides for this punishment, [he] could assess it in the appropriate circumstances”; he also responded to another question by writing that “[he] shouldn’t be the one to decide if someone lives or dies.” During individual voir dire of Juror no. 23, the following occurred:
“[PROSECUTOR]: Well, [Juror no. 23], I guess just to cut to the chase right here. We’re going to be asking for death. I am. And they’re going to be asking for life without parole. And you’ve indicated in your questionnaire that you don’t think you should be the one who decides that; correct?
“[JUROR No. 23]: Correct.
“[PROSECUTOR]: You said in [the juror questionnaire, question] number 83, it could serve a purpose but you don’t think we should decide that for someone?
“[JUROR No. 23]: Right.
“[PROSECUTOR]: And that’s all we’re trying to get at here is what you really think and feel and, of course, it’s very serious. So even though the — and some people are opposed to it. Even though that’s the law in Alabama it’s— you’ve got some people who just don’t think it’s right. And if that’s the way people feel then they shouldn’t sit on a case where that’s what’s being asked for. It wouldn’t be fair for the State obviously. So there’s no shame in that. There’s no harm in that. And even if the Judge were to tell you if you find the Defendant guilty you’ve got to weigh the aggravating and the mitigating circumstances, would you still feel like you could not do that?
“[JUROR No. 23]: I do not feel like I could do that.
“[PROSECUTOR]: That your vote would be life without?
“[JUROR No. 23]: Yes.
“[PROSECUTOR]: You would not do death?
“[Juror No. 23]: Yes.
“[PROSECUTOR]: No matter if the Judge told you that?
“[Juror No. 23]: Yes.
“[PROSECUTOR]: Thank you. That’s all I have.
*357 “THE COURT: [Defense counsel 1]? [Defense counsel 2]?
“[DEFENSE COUNSEL 2]: [Juror no. 23], [the prosecutor’s apparently moved straight to guilt. We’re not going to ask you — we’re going to ask you to return a verdict of not guilty first. There’s a trial before the State gets to try to kill Mr. Woolf. Could you listen to all the evidence in that trial and fairly and impartially balance that evidence and reach a decision?
“[JUROR No. 23]: Yes, sir.
“[DEFENSE COUNSEL 2]: One of the charges, or actually both the charges against Mr. Woolf, right now are capital murder. And if you find Mr. Woolf guilty at the end of all the evidence of one or both of those charges, we would move to another phase where we would put on evidence, it’s called mitigation evidence. The State would put on evidence, aggravation evidence. Could you listen to both sides at that phase and have the death penalty as an option and the reason I ask you that on your questionnaire you believed that the — that you could assess the death penalty in appropriate circumstances and one of those circumstances is murder. Do you think you could do that?
“[JUROR No. 23]: I don’t feel I could impose the death penalty. But, I mean, I could obviously listen to everything and decide guilty or innocent.
“[DEFENSE COUNSEL 2]: And if the State meets the burden that the Judge outlines for you would you consider death as an option? And there’s — at no point in the law is anybody going to tell you you’ve got to vote to kill Mr. Woolf.
“[JUROR No. 23]: Right.
“[DEFENSE COUNSEL 2]: All you have to do is look at the evidence and keep that open as an option. Is there evidence that you could hear that might make you — that would make you keep that as an option?
“[JUROR No. 23]: It’s hard to say because I don’t know the evidence. It’s kind of something that might put you over the edge, you know.
“[DEFENSE COUNSEL 2]: And it’s tough doing all this in a vacuum I know. But I guess what I’m getting at, you think there’s something — you think that you could potentially — or that you would follow the Judge’s instructions and consider death as an option? You don’t have — Nobody is going to tell you have to vote that way.
“[Juror No. 23]: Right. I guess I’m thinking maybe the death penalty is appropriate in some cases but, me personally, I don’t feel like I can say, like, the death penalty should be applied to that person. To me it’s almost like — not that I’m killing that person but, you know, I’m giving approval of it. That’s not what — I can’t do that.
“[DEFENSE COUNSEL]: I want to make sure that you understand this. You don’t have to make that decision. What you have to do is determine whether or not the evidence that is presented to you by either side meets the standard of law that Judge Johnston will give to you. And if the evidence that is submitted meets that legal standard would you be able to consider death as an option?
“[JUROR No. 23]: I guess if it’s, you know, laid out in the law and it meets that criteria, I mean, it kind of sounds like you have to but, you know—
“[DEFENSE COUNSEL 2]: But it would be a hard decision?
“[JUROR No. 23]: Absolutely.
“[DEFENSE COUNSEL 2]: And it’s one that you would agonize over?
*358 “[JUROR No. 23]: Absolutely.
“[DEFENSE COUNSEL 2]: And I completely understand that. I don’t think either side wants anyone who’s going to take this decision lightly. I may be wrong. But it’s something that you would agonize over but you think you could do it if it met the standards as set out by the Judge?
“[JUROR No. 23]: Again, you got to hear all the evidence. I mean, it’s kind of hard. Until put in that position, I mean, I don’t know.
“THE COURT: [Juror no. 23], I’m hearing two things. Because I heard you really say you could never vote for death but then you said it sounds like I’d have to. You wouldn’t never have to. What I want to make sure I’m clear— Let’s try it this way. First we have guilty or not guilty.
“[JUROR No. 23]: Right.
“THE COURT: We’re just assuming we’re going — he’s been found guilty. Then both sides put on evidence because there are two options, either death or life in the penitentiary. And you’re not going to have a score card where one adds up to this one that — like you say it automatically becomes — you wouldn’t have to make that decision. Are you telling us that you could never come to the decision that it would be death?
“[JUROR No. 23]: Yes.
“THE COURT: There’s no right or wrong answer.
“[PROSECUTOR]: He just said yes. Your Honor.
“[JUROR No. 23]: Yes. I just kind of took it as like you were talking about like a score card type thing,
“THE COURT: That’s not what it is. In a way you’re adding them up but it’s not whoseever score is higher that one wins. It’s not you have to make a decision. You’re not a computer here. You will have to make that decision and what I thought I heard when I heard it a minute ago is that you couldn’t ever vote to impose death but maybe I’m wrong.
“[JUROR No. 23]: That is.
“THE COURT: You just couldn’t do that?
“[JUROR No. 23]: (Nods.)

"....

“[PROSECUTOR]: Let the record reflect he just nodded.”
(R. 745-52.)
The State challenged Juror no. 23 for cause and, over Woolfs objection, the circuit court removed the potential juror from the venire.
“ ‘ “[Wjhether a prospective juror in a capital murder case is properly excluded based on the juror’s views concerning the death penalty involves a question of fact. Therefore, a proper review of this determination requires that we give great deference to the trial judge’s discretion, because the judge was present and capable of observing the potential jurors and their responses.” Price v. State, 725 So.2d 1003, 1025 (Ala.Cr.App.1997), aff'd, 725 So.2d 1063 (Ala.1998), citing Wainwright v. Witt, [469 U.S. 412 (1985)].
“‘In Clemons v. State, 720 So.2d 961 (Ala.Cr.App.1996), aff'd, 720 So.2d 985 (Ala.1998), this court stated:
“ ‘ “ ‘Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), set the early standard for a court’s exclusion for cause of venirepersons who oppose the death penalty. The Court in dicta in Witherspoon limited exclusion for cause to those venirepersons who made it “unmistakably clear (1) that they would automatically vote against imposition of capital punish *359 ment ... or (2) that their attitude toward the death penalty • would prevent them from making an impartial decision as to the defendant’s guilt.” Id., 522-23 n. 21, 88 S.Ct. at 1777 n. 21. Subsequently, in Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the Court clarified or modified its decision in Witherspoon by holding that the state may exclude venirepersons in capital cases whose views would “‘prevent or substantially impair the performance of [their] duties as a juror in accordance with his instruction and [their] oath.’” Id., 469 U.S. at 424, 105 S.Ct. at 852 (quoting Adams v. Texas, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980)). The new Witt standard dispensed with the Witherspoon reference to “automatic” decision-making, and eliminated the requirement that a venireperson’s bias be proved with “unmistakable clarity.” 469 U.S. at 424, 105 S.Ct. at 852.’”’
“Burgess v. State, 811 So.2d 557, 570 (Ala.Crim.App.1998), rev’d on other grounds, 811 So.2d 617 (Ala.2000),”
Thompson, 153 So.3d at 118.
Juror no. 23’s answers to the questions propounded to him indicated that his views would have prevented or substantially impaired the performance of his duties. His removal was not, therefore, erroneous.
III.
Woolf asserts that the State improperly excluded black prospective jurors in violation. of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The venire in Woolfs case consisted of 105 potential jurors, 39 of whom were nonwhite. The circuit court excused nine of the potential jurors for. different reasons; three of those nine were non-white. After five days of voir dire, the court excused the remaining 26 venirepersons who had not been questioned individually; 8 of those 26 were black.
With its peremptory strikes, the State removed 11 black potential jurors, and Woolf removed 3 black potential jurors. The final composition of the jury was 10 white and 2 black jurors. Woolf timely raised a Batson objection. The circuit court held that Woolf had established a prima facie case of discrimination, and the circuit court required the State to give reasons for its strikes of the black potential jurors. The circuit court then denied Woolfs motion.
“Evaluation of a Batson claim involves the following three steps:
““‘First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race. [Batson v. Kentucky,] 476 U.S. [79,] 96-97 [106 S.Ct. 1712, 90 L.Ed.2d 69 (1986)]. Second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question. Id., at 97-98 [106 S.Ct. 1712]. Third, in light of the parties’ submissions, the trial court must determine whether the defendant has shown purposeful ■ discrimination. Id., at 98 [106 S.Ct. 1712].” ’
“McCray v. State, 88 So.3d 1, 17 (Ala. Crim.App.2010) (quoting Miller-El v. Cockrell, 537 U.S. 322, 328-29, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003)).”
Sharp v. State, 151 So.3d 342, 358 (Ala. Crim.App.2010).
As noted, the circuit court held that Woolf had demonstrated a prima facie case of discrimination; thus, the circuit court held that the first step of the Batson process had been established.
“Under the second step of the Batson process, the burden shifts to the prose *360 cution to offer a race-neutral reason for striking the juror or jurors in question. Ex parte Branch, 526 So.2d 609, 623 (Ala.1987). See, e.g., Ex parte Bird, 594 So.2d 676, 680 (Ala.1991). The prosecution must provide ‘a clear, specific, and legitimate reason for the challenge which relates to the particular case to be tried, and which is nondiscriminatory.’ Ex parte Branch, 526 So.2d at 623. See also Ex parte Bird, 594 So.2d at 680. The reason for the strike, however, need not rise to the level of a strike for cause, and the issue is the facial validity of the prosecutor’s explanation. Ex parte Branch, 526 So.2d at 623; Doster v. State, 72 So.3d 50, 73 (Ala.Crim.App. 2010).”
Sharp, 151 So.3d at 358-59.
“ ‘ “Within the context of Batson, a ‘race-neutral’ explanation ‘means an explanation based on something other than the race of the juror. At this step of the inquiry, the issue is the facial validity of the prosecutor’s explanation. Unless a discriminatory intent is inherent in the prosecutor’s explanation, the reason offered will be deemed race neutral.’ Hernandez v. New York, 500 U.S. 352, 360, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991). ‘In evaluating the race-neutrality of an attorney’s explanation, a court must determine whether, assuming the proffered reasons for the peremptory challenges are true, the challenges violate the Equal Protection Clause as a matter of law.’ Id. ‘[Evaluation of the prosecutor’s state of mind based on demeanor and credibility lies “peculiarly within [aj trial judge’s province.”’ Hernandez, 500 U.S. at 365, 111 S.Ct. at 1869.”
“ ‘Allen v. State, 659 So.2d 135, 147 (Ala. Crim.App.1994) (emphasis added). See also Rogers, 819 So.2d at 649. “‘The trial court is in a better position than the appellate court to distinguish bona fide reasons from sham excuses.’” Harris v. State, 2 So.3d 880, 899 (Ala.Crim.App. 2007) (quoting Heard v. State, 584 So.2d 556, 561 (Ala.Crim.App.1991)). Thus, “‘“[o]n appeal, the trial court’s ruling on the question whether the responding party offered legitimate race-neutral reasons will not be overturned unless it is clearly erroneous.” ’ ” Harris, 2 So.3d at 899 (quoting Harrison v. State, 879 So.2d 594, 607 (Ala.Crim.App.2003) (quoting in turn Ex parte Brooks, 695 So.2d [184] at 190 [ (Ala.1987) ])). “ ‘ “A finding is ‘clearly erroneous’ when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.” ’ ” Fletcher v. State, 703 So.2d 432, 436 (Ala.Crim.App.1997) (quoting Davis v. State, 555 So.2d 309, 312 (Ala. Crim.App.1989) (quoting in turn Powell v. State, 548 So.2d 590, 594 (Ala.Crim.App.1988), aff'd, 548 So.2d 605 (Ala. 1989))).
[[Image here]]
“ ‘... It is well settled that “[a]s long as one reason given by the prosecutor for the strike of a potential juror is sufficiently race-neutral, a determination concerning any other reason given need not be made.” Johnson v. State, 648 So.2d 629, 632 (Ala.Crim.App.1994). See also Jackson v. State, 791 So.2d 979, 1009 n. 6 (Ala.Crim.App.2000); Brown v. State, 705 So.2d 871, 874 (Ala.Crim.App.1997); and Wood v. State, 715 So.2d 812, 816 (Ala.Crim.App.1996), aff'd, 715 So.2d 819 (Ala.1998). “Where a prosecutor gives a reason which may be a pretext, .,. but also gives valid additional grounds for the strike, the race-neutral reasons will support the strike.” Battle v. State, 574 So.2d 943, 949 (Ala.Crim. App.1990).’ ”
*361 Sharp, 151 So.3d at 359 (quoting Martin v. State, 62 So.3d 1050, 1058-60 (Ala.Crim. App.2010)).
We further stated in Sharp-.
“In the third step of the process, the defendant has the opportunity to offer evidence indicating that the reason or explanation offered by the State for challenging the juror in question is merely a sham or pretext. Ex parte Branch, 526 So.2d at 624. Throughout the Batson process, ‘[t]he defendant maintains at all times ... the ultimate burden of proving intentional discrimination.’ United States v. Houston, 456 F.3d 1328, 1335 (11th Cir.2006) (citing Batson, 476 U.S. at 94 n. 18).
“In light of both parties’ submissions, the trial court must determine whether the defendant has carried his or her burden of showing purposeful discrimination. See Ex parte Brooks, 695 So.2d 184, 190 (Ala.1997); Ex parte Branch, 526 So.2d at 624. See also Fletcher v. State, 703 So.2d 432, 435 (Ala.Crim.App. 1997) (When the defendant challenges as pretextual the prosecutor’s explanations as to a particular venireperson, the inquiry becomes factual in nature and moves to step three. At this step the trial court must resolve the factual dispute, and whether the prosecutor intended to discriminate is a question of fact. Hernandez v. New York, 500 U.S. 352, 364-65, 111 S.Ct. 1859, 1868-69, 114 L.Ed.2d 395 (1991).’). In making that determination, the trial court must confront the ‘decisive question’ and evaluate the credibility of the prosecution’s explanation, Hernandez v. New York, 500 U.S. 352, 365 (1991), ‘in light of all evidence with a bearing on it,’ Miller-El v. Dretke, 545 U.S. 231, 252 [125 S.Ct. 2317, 162 L.Ed.2d 196] (2005). See also Miller-El v. Cockrell, 537 U.S. at 338-39; Batson, 476 U.S. at 98. Cf. Greene v. Upton, 644 F.3d 1145, 1155 (11th Cir. 2011) (‘Batson does not require elaborate factual findings. See Miller-El v. Cockrell, 537 U.S. 322, 328-29, 123 S.Ct. 1029, 1035, 154 L.Ed.2d 931 (2003); see also Hightower v. Terry, 459 F.3d 1067, 1072 n. 9 (11th Cir.2006) (‘We may therefore make ‘the common sense judgment’ — in light of defense counsel’s failure to rebut the prosecutor’s explanations and the trial' court’s ultimate ruling — that the trial court implicitly found the prosecutor’s race-neutral explanations to be credible, thereby completing step three of the Batson inquiry.”)’). In addition, ‘“[t]he explanation offered for striking each black juror must be evaluated in light of the explanations offered for the prosecutor’s other peremptory strikes, and as well, in light of the strength of the prima facie case.”’ Ex parte Bird, 594 So.2d 676, 683 (Ala.1991) (quoting Gamble v. State, 257 Ga. 325, 327, 357 S.E.2d 792, 795 (1987)). In other words, all relevant circumstances must be considered in determining whether purposeful discrimination has been shown. See, e.g., Snyder v. Louisiana, 552 U.S. 472, 478, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008) (‘[I]n reviewing a ruling claimed to be a Bat-son error, all of the circumstances that bear upon the issue of racial animosity must be consulted.’).
[[Image here]]
“Smith v. Jackson, 770 So.2d 1068, 1072-73 (Ala.2000).
[[Image here]]
“‘On appeal, a trial court’s ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous. See Hernandez v. New York, 500 U.S. 352, 369, 111 S.Ct. 1859, 114 L.Ed.2d 395, (1991) (plurality opinion); id., at 372, 111 S.Ct. 1859, (O’Connor, J., joined by Scalia, J., con *362 curring in judgment). The trial court has a pivotal role in evaluating Batson claims. Step three of the Batson inquiry involves an evaluation of the prosecutor’s credibility, see 476 U.S. at 98, n. 21, 106 S.Ct. 1712 and “the best evidence [of discriminatory intent] often will be the demeanor of the attorney who exercises the challenge,” Hernandez, 500 U.S. at 365, 111 S.Ct. 1859 (plurality opinion). In addition, race-neutral reasons for peremptory challenges often invoke a juror’s demeanor (e.g., nervousness, inattention), making the trial court’s firsthand observations of even greater importance ....
“552 U.S. at 477....
[[Image here]]
“The third step of the Batson analysis has been further explained:
“ ‘The reasons stated by the prosecutor provide the only reasons on which the prosecutor’s credibility is to be judged. United States v. Houston, 456 F.3d 1328, 1335 (11th Cir.2006). The credibility of the prosecution’s explanation is to be evaluated considering the “totality of the relevant facts,” including whether members of a race were disproportionately excluded. Hernandez [v. New York], 500 U.S. [352] at 363, 111 S.Ct. at 1868 [ (1991) ] (quotation marks and citation omitted). Questions arise regarding the credibility of the explanation and the possibility that the explanation is pretextual (1) when the prosecutor’s explanation for a strike is equally applicable to jurors of a different race who have not been stricken, Caldwell v. Maloney, 159 F.3d 639, 651 (1st Cir.1998); (2) upon a comparative analysis of the jurors struck and those who remained, Turner v. Marshall, 121 F.3d 1248, 1251-52 (9th Cir. 1997), including the attributes of the white and black venire members, Houston, 456 F.3d at 1338; (3) or when the prosecution fails to engage in a meaningful voir dire examination on a subject that it alleges it is concerned, Miller-El [v. Dretke], 545 U.S. [231] at 246, 125 S.Ct. at 2328 [ (2005) ]. Evidence of purposeful discrimination may be shown through side-by-side comparisons confirming that the reasons for striking a black panelist also apply to similar non-black panelists who were permitted to serve. See id. at 241, 125 S.Ct. at 2325. A prosecutor’s reasonable explanation for objecting to a black panelist based on his or her opinions or comments may be undercut by the prosecution’s failure to object to other white panelists who expressed similar views, and may be evidence of pretext. Id. at 248, 125 S.Ct. at 2329-30. The prosecutor’s failure to strike similarly situated jurors is not pretextual, however, “where there are relevant differences between the struck jurors and the comparator jurors.” United States v. Novaton, 271 F.3d 968, 1004 (11th Cir.2001). The prosecutor’s explanation “does not demand an explanation that is persuasive, or even plausible; so long as the reason is not inherently discriminatory, it suffices.” Rice v. Collins, 546 U.S. 333, 338, 126 S.Ct. 969, 973-74, 163 L.Ed.2d 824 (2006) (quotation marks and citation omitted). Neither a prosecutor’s mistaken belief about a juror nor failure to ask a voir dire question provides “clear and convincing” evidence of pretext. McNair [v. Campbell], 416 F.3d [1291] at 1311-12 [ (11th Cir.2005) ].’
“Parker v. Allen, 565 F.3d 1258, 1271 (11th Cir.2009) (emphasis added). See also United States v. Walker, 490 F.3d *363 1282, 1294 (11th Cir.2007) (providing that because the ‘trial judge is in the best position to evaluate an attorney’s candor and ferret out purposeful discrimination,’ an appellate court will defer to trial court’s findings on genuineness of reasons even when ‘troubled by the weakness of record evidence’). The evaluation of the credibility of the prosecutor’s explanation in the third step demands consideration of the totality of the relevant facts, and we defer to a trial court’s findings as to the ‘genuineness’ of the prosecutor’s proffered reason or reasons. See, e.g., Snyder, 552 U.S. at 477; Walker, 490 F.3d at 1294.
“‘The objecting party may carry its burden by showing that the striking party’s race-neutral reason is a mere pretext for discrimination.’ United States v. Bernal-Benitez, 594 F.3d 1303, 1312 (11th Cir.2010). As noted above, one way the defendant may demonstrate that the offered reason is a pretext is to show that it applies with equal force to veniremembers of another race who were not struck. Miller-El v. Dretke, 545 U.S. at 241.”
Sharp, 151 So.3d at 360-63.
On appeal, Woolf challenges the State’s proffered reasons for its strikes of the following black prospective jurors: 6, 55, 66, 76, 40, 69,70, and 78.

Jurors No, 6 and No. 55

The State asserted that it struck Jurors no. 6 and no. 55 because of their answers regarding the death penalty. Specifically, in her questionnaire, Juror no. 6 stated that she was not in favor of the death penalty, that she did not believe that she should kill anyone, and that she thought the death penalty served no legitimate purpose in society. The State, in describing its reasons for striking Juror no. 6, pointed out to the circuit judge that Juror no. 6 was one who had “ping-ponged” in describing her views on the death penalty and that “she was, if you recall, ... [a] very timid, shy woman who was screaming T don’t believe in the death penalty’ but said some little something that she couldn’t get excused for cause at the very end of that.” (R. 1260.)
According to the State, Juror no. 55
“was also one of those who was against the death penalty but at the end came around and said she could do it. But she was not very firm in that. In her questionnaire where it says are you in favor of the death penalty, she checked both yes and no. Says, they should be punished for their crime but there’s got to be another way. Something I can’t read, at putting people to death just to kill them too. So in other words, she did not think that that was the best way to handle situations like that. That was question 82. She was one of those back and forth, back and forth, back and forth.”
(R. 1263-64.) Juror no, 55 was questioned extensively during individual voir dire, including the following relevant exchange:
“[PROSECUTOR]: Now, as you know this is a case in which if the Defendant is found guilty I will be asking you to vote for death.
“[JUROR No. 55]: Okay.
“[PROSECUTOR]: The law in Alabama allows that. Some people don’t believe in it. That’s about as simple as you can put it. Regardless of the law they don’t believe in it. Or some people do believe in it in theory but know that in practice they could not do it. Have you given much thought to this and whether you could or couldn’t?
“[JUROR No. 55]: To be honest-
“[PROSECUTOR]: That’s a very important — yeah, be honest.
*364 “[JUROR No. 55]: I haven’t given much thought to it.
“[PROSECUTOR]: Okay. Well, that’s a very — it’s a very very critical part of the trial. And obviously if there’s a juror on there who knows they could never vote death, you know, you don’t want that juror on that jury and it wouldn’t be fair to have people on there who just say no I couldn’t do it. There’s no point in me being there. So if you haven’t thought about it up until now, I would like for you to think about it now and don’t be embarrassed and don’t be if the answer is you can’t that’s fíne. If you can then that’s fine. It doesn’t matter whichever way it goes.
“[JUROR No. 55]: I wouldn’t have a problem of voting against it.
“[PROSECUTOR]: Voting for it or against it?
“[JUROR No. 55]: I wouldn’t have a problem voting for it or against it. It’s either or. I just have to hear the whole thing.
“[PROSECUTOR]: But you could vote death?
“[JUROR No. 55]: I could, yes.
[[Image here]]
“[PROSECUTOR]: Okay. Well, going to your questionnaire, when it says are you in favor of the death penalty you checked yes and no. Do you remember that? That indicates some sort of uncertainty there if you’re checking yes and no. And then you said, yes, they should be punished for their crimes; no, there’s got to be a better way of putting people to death just kill them too.
“[JUROR No. 55]: Could I?
“[PROSECUTOR]: Yeah.
“[JUROR No. 55]: The reason I said that—
“[PROSECUTOR]: Talk loud.
“[JUROR No. 55]: The reason I said that is because to put them to death I would — it wouldn’t bother me to agree with that but I would like still find another way so they can be punished for what they did.
“[PROSECUTOR]: Well, death would punish them for what they did I would think.
“[JUROR No. 55]: Yeah, it would have. You’re right. Yes. But I say they should be punished.
“[PROSECUTOR]: Well, we’re all in agreement they should punished if they’re found guilty. But the question is should it be death or should it be life without parole?
“[JUROR No. 55]: I say life without parole.
“[PROSECUTOR]: That’s what I thought. Now it’s taken us a long time to get here.
“[JUROR No. 55]: I’d say life without parole.
“THE COURT: Ma’am, let me ask you. What you’re saying is your answer is your answer. And you’re talking about there’s got to be another way or should be another way, that’s the kind of thing legislators do, they make the laws. Your option, if you’re on the jury, is to choose one of two ways. It’s all you’ve, either death or life without parole. You can’t — me, you, we can’t be thinking up other ways because the legislature made the law. Are you saying if you were on the jury and it went to the guilt phase went to the sentencing phase, that you would only or could only choose life without parole and not death? Or could you look at both of those?
“[JUROR No. 55]: I would have to look at both of them.
“THE COURT: That’s just opposite of what you just said. So I don’t want us to try to trick you into anything. *365 We’ll slow down a little bit. You’re in the jury first. The jury first decides whether the defendant is guilty or not guilty. And so we go through that phase. And in order for me to get to the second question we’ve got to assume the defendant is found guilty. Then we go to the second phase. That’s the sentencing phase and that’s kind of a mini-trial trial in which aggravating and mitigating factors are presented. And after — that’s the stuff that looks bad and looks good. I’m going to instruct you what the law is on all of that. It takes a good amount of time. There is only two options you have, either death or life in the penitentiary. Now, if you’re on that jury could you listen to the facts and the law and choose one of those, depending on what you feel under the law is appropriate, or would you just lean to life in the penitentiary automatically because of you’re feelings?
“[JUROR No. 55]: No, I wouldn’t.
“THE COURT: You could give them both equal weight?
“[JUROR No. 55]: I would have to listen to the case both to see how was it done and was it done deliberately or was it done accidentally. If it was done deliberately I would say death. If it’s done accidentally—
“THE COURT: I know you don’t know what the law is. But you could listen to the law and the facts and everything I tell you, and then after that both options would be open and you would decide at that time?
“[JUROR No. 55]: I would decide at that time, yes.
“[PROSECUTOR]: Can I follow up a little?
“THE COURT: Yes, please, please.
“[PROSECUTOR]: I’m just curious as to why just about two minutes ago you said death.
“[JUROR No. 55]: I’m sorry. But I have to listen to both sides.
“[PROSECUTOR]: Of course you do. But — Look. I know it sounds complicated and it’s not complicated. It’s not complicated at all. It’s just when it comes down to it and you’re in the -jury box and I’m saying, I want you to vote death, weighing everything, you know whether you could do death or not.
“[JUROR No. 55]: Yes, I could.
“[PROSECUTOR]: Why did you just — I’m just curious as to why a little bit ago you said you could not.
“[JUROR No. 55]: I think, if I’m not mistaken, I would have to weigh it out. I wanted to weigh it out.
“[PROSECUTOR]: Okay. No other questions.
“THE COURT: Let me ask you again. Some of this is the last person who talks to you. You don’t know what the law is or the facts.
“[JUROR No. 55]: No, I don’t.
“THE COURT: If you were chosen to be on this jury, could you fair and impartial — could you be a juror and impartial juror and listen to all the law and the evidence and reach a decision in both the guilt phase and the sentencing phase based only on the law and the evidence? That’s the first question.
“[JUROR No. 55]: Okay.
“THE COURT: Is that a yes?
“[JUROR No. 55]: Yes.
“THE COURT: Could you give either option life or death, could you either option, would that be open depending on what the evidence showed you?
“[JUROR No. 55]: Yes.
“THE COURT: It wouldn’t lean towards death because this was a child?
“[JUROR No. 55]: No.
“[PROSECUTOR]: I’ve — Thanks.
*366 “[JUROR No. 55]: You don’t understand me?
“[PROSECUTOR]: I’ve got just a couple of more and I know you probably feel like you’re on the witness stand; you’re not. But when [Woolfs attorney] asked you that question, said, if you find that he intentionally killed, intentionally
“[JUROR No. 55]: If he intentionally?
“[PROSECUTOR]: Intentionally, intentionally killed his two-and-a-half-year-old child, would you think death would be the appropriate punishment?
“[JUROR No.' 55]: Yes.”
(R. 1028-38.) At this point; the State moved to have Juror no. 55 removed for cause. Although the circuit judgé denied the State’s motion, the judge agreed with defense counsel’s assessment that Juror no. 65 “was all over the board.” (R. 1041.)
Initially, we note that mixed views on or reservations concerning the death penalty are a race-neural reason for a strike of a prospective juror. See, e.g., Whatley v. State, 146 So.3d 437 (Ala.Crim.App.2010) (opinion on return to remand). Woolf argues, however, that this reason, as applied to Jurors no. 6 and no. 56, was a pretext, ■ In support of this argument, Woolf cites two white jurors who sat on Woolfs jury — Jurors no. 11 and no. 63— who Woolf asserts had “similar reservations” about the death penalty.
During individual voir dire, the folio-wing exchange with Juror no. 11 occurred:
“[PROSECUTOR]: And in terms of the death penalty if you were selected to sit on this jury and if the jury found the Defendant guilty, okay, I mean, rest assured I will be asking you to vote for death.
“[JUROR No. 11]: Okay.
“[PROSECUTOR]: Now, really thinking about it could you actually do that if you thought that the case merited it?
“[JUROR No. 11]: If it was a hundred percent that’s what it was, then I could see it. But if there was any doubt I just don’t it would have to be a Hundred -percent certain that that’s what happened.
“[PROSECUTOR]: Okay,
“[JUROR No, 11]: Does that make -gense?
“THE COURT: A few more questions will come because of that answer.
“[PROSECUTOR]: That’s going to whether [Woolf] is guilty in the first place; fight?
“[JUROR No. 11]: Right.
“[PROSECUTOR]: Suppose you find — If you vote guilty—
“[JUROR No. 11]: Then you’re pretty certain. - -
' “[PROSECUTOR]: Yeah. So if you get to that point..., ■«
“[JUROR No. 11]: Yeah, then, I mean, that’s part of the law. So that’s what-you do.
“[PROSECUTOR]: Yeah. It is part of the law and the reason we’re going into this is because it is such a very serious thing. It’s an awesome responsibility that you’re going to have here, that we want to be sure that even though you may be in favor of it or so, oh, if that’s law just I guess we’re saying kind of look inward. Do you have qualms or do you know you could do it?
“[JUROR No. 11]: It would be hard but if I had to I could. I guess
“[PROSECUTOR]: You don’t have to do anything. So it would be hard?
“[JUROR No. 11]: Yeah.
. “[PROSECUTOR]: And why would that be?
*367 • “[JUROR No. 11]: Well, basically you’re telling somebody to take somebody’s life.
“[PROSECUTOR]: Right, even though you’re not taking it.
“[JUROR No. 11]: Right.
“[PROSECUTOR]: The system is in place for that to happen,
“[JUROR No. 11]: I mean, it should be hard decision for anybody I would hope.
“[PROSECUTOR]: Exactly. But you’re sure that even though it would be hard and even though it would be something I’m sure you rather be doing anything other than probably sitting right here answering my questions right now, you really and truly could do it if the aggravating circumstances outweighed the mitigating circumstances?
“[JUROR No. 11]: Yes.
“[PROSECUTOR]: That’s all I have. Thank you.
“THE COURT: Let me ask you a quick question, sir. I think you said earlier that it would have to be a hundred percent. If I — I think we were talking about finding somebody guilty or not guilty.
“[JUROR No. 11]: Right.
“THE COURT: If I told you that the law in the state was that the State’s burden was to prove the Defendant [guilty] beyond a reasonable doubt and to explain what that was, rather than a hundred percent, but to beyond a reasonable doubt, could you accept that and follow the law?
“[JUROR No. 11]: Yes,”
(R. 647-50.)
During individual voir dire of Juror no. 63, the following exchange occurred:
“[PROSECUTOR]: ... I just want to ask you a few questions about your stance on the death penalty.
“[JUROR No. 63]: Okay.
“[PROSECUTOR]: I noticed in your questionnaire you said that you thought the death penalty was okay but you were'you thought life in prison is usually a better option?
“[JUROR No. 63]: Well, I think it’s almost just as an equal reason to — Let me rephrase that. I wouldn’t say it’s equal but it’s close to the death penalty to me. Because I believe that knowing that you’re going to spend your life in prison and never going to see freedom is almost just as bad as the death penalty. A lot of cases I would think that that is the better choice.
“[PROSECUTOR]: Because in your mind that would be just as bad of punishment?
“[JUROR No. 63]: Right.
[[Image here]]
“[PROSECUTOR]: Yeah. But if we get to the penalty phase and Mr. Evans had said repeatedly that they will be asking for life without. So given the fact that they don’t consider that to be death to be such a.great thing, they’d rather have life without, would that influence your ability? In other words, put aside what you think would be the worse punishment and let’s focus on your opinion about you personally being able to say, I vote for death.
“[JUROR No. 63]: I think that if I had to review — if I had to review the facts—
“[PROSECUTOR]: You will.
“[JUROR No. 63]: I know. That’s what I’m saying, if I’m chosen, I mean. I could if I believed that personally that that would be the best choice, death penalty, I could.
“[PROSECUTOR]: The reason we ask that of course, is because that’s a *368 very very serious thing, very serious thing. Some people have thought about it off and on throughout their lives just out of curiosity and reading things in the paper. Some people haven’t given it much thought until they end up in the situation like you’re in now. Have you thought about it much before you got selected to serve on this panel?
“[JUROR No. 63]: Yes. I’ve thought about it and I’ve always believed that the death penalty it is a good choice in certain cases.
“[PROSECUTOR]: Okay. Because some people say no. You shouldn’t kill another person. It’s killing that person. Or some people say I believe in it but I personally couldn’t do it.
“[JUROR No. 63]: Right.
“[PROSECUTOR]: If the facts, and you’ll see the facts. We’re talking, I guess, theoretically here. You’ll hear the facts. You’ll hear the law. If it points toward death you could do it?
“[JUROR No. 63]: Yes.
“[PROSECUTOR]: Okay. Are you going to look at him?
“[JUROR No. 63]: I mean, if I — If I believe, you know, that he’s truly guilty and the crime is that punishable enough where I believe that that’s the best option, then I could.
“[PROSECUTOR]: Okay. We just want to be absolutely sure.
“[JUROR No. 63]: Okay.”
(R. 1113-16.)
We do not agree with Woolfs assertion that the State’s proffered reason for striking Jurors no. 6 and no. 55 was pretextual. The responses of Jurors no. 6 and no. 55 were substantially different than those of Jurors no. 11 and no. 63. In their responses, Jurors no. 11 and no. 63 did not appear to have the emotional opposition to the death penalty that Juror no. 6 initially expressed by, as the State described to the circuit judge without comment from Woolfs counsel, “screaming [that she didn’t] believe in the death penalty.” Additionally, neither Juror no. 11 nor Juror no. 63 expressed the wide range of inconsistent responses regarding the death penalty that Juror no. 55 did. Accordingly, Woolf has not demonstrated clear error in the circuit court’s denial of the Batson motion as to Jurors no. 6 and no. 55. See, e.g., Parker, 565 F.3d at 1271 (“The prosecutor’s failure to strike similarly situated jurors is not pretextual, however, ‘where there are relevant differences between the struck jurors and the comparator jurors.’ United States v. Novaton, 271 F.3d 968, 1004 (11th Cir.2001).”).

Juror No. 66

In giving its reasons for striking Juror no. 66, the State proffered the following:
“[PROSECUTOR]: [Juror no.] 66. She is the lady whose son — she’s a black female. Her son had been arrested for domestic violence three times. Was that the one, [second prosecutor], that was against her?
“[SECOND PROSECUTOR]: Yeah.
“[PROSECUTOR]: Was against her and she had had to have him committed and on medication and I was thinking since this is a domestic violence situation and I’m sure the defense is probably going to put on some evidence about medication for the defendant and so on that that would probably be just a little too close to home for her to be totally objective.”
Woolf contends that Juror no. 2, a white male who served on Woolfs jury, was similarly situated to Juror no. 66. Specifically, Woolf cites Juror no. 2’s disclosure that his wife had “bipolar disorder” and was taking medication for that condition.
*369 We disagree with Woolfs assertion that Juror no. 2 was similarly situated to Juror no. 66. Juror no. 2 stated that his wife had responded well to her medication and had not had “any episodes in a long time.” (R. 650.) More significantly, Juror no. 2 did not have a history of incidents of domestic violence allegedly committed against him. Therefore, the circuit court did not clearly err in denying Woolfs Bat-son challenge as to Juror no. 66.

Juror No. 76

In giving its reasons for striking Juror no. 76, the State proffered the following:
“[PROSECUTOR]: ... She — couple of things on her. She has a husband who was charged with I forget what he was charged with exactly, but he was found not guilty. Do you remember?
“[SECOND PROSECUTOR]: Assaulted somebody.
“[PROSECUTOR]: Right. He was a police officer. He assaulted somebody. He was found not guilty. She also works for Bishop State Community College and our office indicted a lot of people at Bishop State Community College. In fact, she gave testimony in a civil matter on Bishop State Community College fraud issues. She testified about one of the defendants that we had indicted criminally meeting with, ‘students,’ who our position was really weren’t students, after hours. That would be students that we believed were actually phony enrollments to get money. She said that she is the one who actually created and took the ID photo for what we believe was a phony student named Pearlie May French. I don’t know if you remember from — or if this even got to come out. But Pearlie May French was the one-legged grandmother who was signed up for softball and so we found her testimony under oath not to be very credible.”
(R. 1268-69.)
Woolf contends that the State’s failure “ ‘to engage [Juror no. 76] in any meaningful voir dire’ ” regarding any of the matters identified above “ ‘is evidence that the explanation is a sham and a pretext for discrimination.’” (Woolf's brief, p. 50 (quoting Ex parte Bird, 594 So.2d at 683).) We disagree under the circumstances of this case. Here, at least one of the two prosecutors had encountered Juror no. 76 before, had heard testimony regarding her employment, and did not find her to be credible. No evidence before us indicates that the prosecutor was incorrect in these statements, and even if there were such evidence, that would not necessarily demonstrate clear error. Accordingly, the circuit court did not clearly err in denying the Batson challenge as to Juror no. 76. See Stephens v. State, 580 So.2d 11, 20 (Ala.Crim.App.1990) (“[T]he fact that a prosecutor distrusts a juror or finds his responses not to be credible has also been held to be a sufficiently race-neutral reason for using a peremptory challenge.”); see also Parker, 565 F.3d at 1271 (“Neither a prosecutor’s mistaken belief about a juror nor failure to ask a voir dire question provides ‘clear and convincing’ evidence of pretext.”).

Juror No. ⅛0

The State offered the following explanation for its strike of Juror no. 40, a black female:
“She said that the only situation in which she could vote for the death penalty would be if there was sexual molestation involved. And she also had a situation where I believe I just have the words falsely accused. She had been falsely accused of taking money from work and how bad it made her feel. And like I said, and that she would *370 require sexual molestation which in this case we do not have. And she said without that she could not impose death.”
(R. 1262-63.) Juror no. 40 was clear that, without “know[ing] the facts,” she was not sure she could impose the death penalty in any case other than one involving “sexual molestation” of a child, a fact not present in Woolfs case. (R. 867.) This was a sufficiently race-neutral reason for the State to strike Juror no. 40, and the trial court did not clearly err in denying the Batson challenge as to the State’s strike of Juror no. 40.

Juror No. 69

The State proffered the following regarding its strike of Juror no. 69, a black female:
“[PROSECUTOR]: [Juror no.] 69. Oh, this is the lady who started out — she was one of the most extreme, I guess, examples of being so adamantly opposed to the death penalty and then in the end ended up saying something that would keep her on the jury.
“THE COURT: This is 69?
“[PROSECUTOR]: Yes, Your Honor. She, in her questionnaire, said, question 82, are you in favor of the death penalty? No. Religious belief. God is the only one that should take a life. Under the question 84 she checked the box, I could never assess death penalty regardless of the facts and the circumstances. Question 86, the death penalty should never be assessed as a punishment for any crime and she checked that. And she was one of the ones — So she did that in her questionnaire. Then during the general voir dire she was one of the ones who raised her hand and said, I’m not in favor of death. I couldn’t do it. And then when I asked her the questions in individual voir dire, again, could not do death. Then the ping pong match started and she equivocated shall we say.”
(R. 1266.) The “ping pong match” the prosecutor referred to is the individual voir dire, consisting of nine pages of transcript, in which Juror no. 69 ultimately backtracked from her questionnaire responses — which she attempted to distinguish as “personal opinion” — and stated that she could follow the law if the judge instructed her to do so. (R. 1164-63.) Woolf argues that Juror no. 69 was similarly situated to white Jurors no. 11 and no. 63. We disagree. Juror no. 69’s initial statements of opposition to the death penalty were clear and were based on religious reasons, and in her individual voir dire she was much more equivocal than was Juror no. 11 or Juror no. 63. Accordingly, the trial court did not clearly err as to its denial of the Batson challenge regarding Juror no. 69.

Juror No. 70

Regarding Juror no. 70, a black male, the State offered the following reason for its strike:
“[Juror no.] 70 is the gentleman who is — he’s an atheist as he said in his questionnaire. He has one of his best friends charged with capital murder and awaiting trial for capital murder and when I asked him the question, would that make you sympathetic toward the defendant he said, yes, that it would. In addition to that he also had a cousin who was charged with murder. He also said in his questionnaire that he said the gist ■ of it was if somebody showed remorse for what they did then that would make him more inclined to life without parole. And in this particular situation I guess some of [Woolfs] actions afterward could be interpreted as either remorse for the fact that he was now in trouble or I suppose somebody could interpret it *371 as remorse for the fact that he did it but whatever.”
(R. 1267-68.) Woolf notes that the circuit court “acknowledged! ] [that Juror no. 70⅛] religious belief alone (or lack thereof) is not a race-neutral reason for a peremptory strike,” and- Woolf argues that “the mere fact that someone may be sympathetic is not necessarily a race-neutral reason for a peremptory strike.” (Woolfs brief, p. 55.) Woolf does not address, however, the third reason identified by the State: that one of Juror no. 70’s “best friends [was] charged with capital murder” and “he also had a cousin who was charged with murder.” Woolf has not shown that the circuit court clearly erred in denying the Batson challenge as to Juror no. -70. See, e.g., Johnson v. State, 43 So.3d 7, 12 (Ala.Crim.App.2009) (citing Thomas v. State, 611 So.2d 416 (Ala.Crim.App.1992), for the proposition that “previous criminal charges, prosecutions, or convictions of potential jurors or their relatives are a race-neutral reason for striking them”); see also Whatley, 146 So.3d at 455 (previous criminal charges, prosecutions, or convictions of prospective juror or family member are valid race-neutral reasons for a peremptory strike).

Juror No. 78

Regarding Juror no. 78, a black female, the State proffered the following explanation for its strike:
“Number 78 is the lady who had the closed-head injury who said that she could not remember things very well, that she would have to get her children — that she’d be talking to her children and she would have done something one day and she couldn’t remember. And first she said, you know, I just don’t think I could do this and be fair. - She also said in terms of the death penalty, first she said, well, I would — I couldn’t do it unless I saw it or unless it was on video or something- of that nature.”
(R. 1262.) During individual voir dire, in addition to discussing her head injury and memory problems, Juror no. 78, as noted by the State, initially stated that she would have to see a crime on “something like a video” before she could vote to impose the death penalty. (R. 1216.) Additional questioning produced the following exchange:
“[PROSECUTOR]: Well, you said earlier you couldn’t go death.
“[JUROR No. 78]: No. I said only if I had concrete evidence.
' “[PROSECUTOR]: And you said, like — You first started out saying like if you saw it..
“[JUROR No. 78]: Yeah, if I saw someone kill someone automatically—
“[PROSECUTOR]: And then you said like if I had a video of it.
“[JUROR No. 78]: — it’s death, yes. Yes.
“[PROSECUTOR]: Well, you’re not going to have any of that, -
“[JUROR No. 78]: Okay. That would be kind of a conflict with me.
“[PROSECUTOR]: A conflict with you?
“[JUROR No. 78]: Uh-huh.”
(R. 1221-22.)
The State had previously moved to strike Juror no. 78 for cause; the following exchange occurred regarding that motion, which the circuit court denied:
- “[PROSECUTOR]: Your Honor, we challenge’ her for cause. She was in the hospital three and a half months and had a closed-head injury. She said that in her-questionnaire. She doesn’t seem to be just making this up. And while maybe she could take a little something down I think she was being just about as *372 honest as she could be to say that she thought she would have some trouble remembering sometimes and she gave you an example she couldn’t — her daughter — I think she said her daughter or her son would say well, mama, — But it goes beyond just the kind of loss of—
“THE COURT: Her questionnaire has some like maybe she started writing something and just stopped. I think your religion she put B.
“[PROSECUTOR]: And she said, you know, T was in a car wreck in 2007. It was life or death. My members is still not right.’ Well, I guess, her — I thought when she said that she might have meant like her fingers or toes or but I think she meant her memory.
“[DEFENSE ATTORNEY]: She said remembers and I think—
“[PROSECUTOR]: In there she said ‘my members is still not right.’
“[DEFENSE ATTORNEY]: I think that may have been shorthand for remembers. But in any event. Judge, I think when you instruct the jury at the end of the case you’re going to say everybody’s going to sit back there and you’re going to talk about the case and everybody use your collective memory and she obviously—
“[PROSECUTOR]: Well, she isn’t going to have a collective memory is the problem.
“[DEFENSE ATTORNEY]: And obviously, she’s — She told me she can weigh the—
“THE COURT: I know what everybody is saying. It’s just — We’re all on thin ice here. As you all know she doesn’t want to get off here. We’re basically saying she doesn’t have the qualifications as a juror to read, speak and understand and follow instructions given to her in the English language or we’re saying she’s incapable by reason of physical and mental ability to render satisfactory jury service. And she says she is.
“[PROSECUTOR]: I thought she said she wasn’t.
“THE COURT: She said she thought she could. I’m going to deny your challenge for cause.”
(R. 1226-28.)
On appeal, the State points out that although Juror no. 78 would have been able to take notes as a juror, she also stated she was “not sure” about her ability to remember short-term details. Specifically, the State cites the following exchange from the individual voir dire of Juror no. 78:
“[PROSECUTOR]: So in all honesty given the fact that you physically cannot do that, do you think you’ll be able to really remember enough because of your short-term memory loss?
“[JUROR No. 78]: I’m really not sure. I don’t think I will be able to remember, not everything. As I said as time go it would come back. But see, you may need something to happen right then and I probably say I can’t remember because I can’t.”
(R. 1223.) Given Juror no. 78’s apparent memory problems and her equivocation on the appropriateness of the death penalty as punishment, we cannot say the circuit court clearly erred in denying the Batson challenge as to Juror no. 78.
IV.
Woolf argues that the circuit court erred in admitting certain crime-scene photographs that, he contends, were “gruesome” and that the “cumulative nature” of the photographs “merely increased the prejudiced he suffered.” (Woolfs brief, p. 103.) He asserts that at his trial “there was no dispute that the *373 victims had been shot by Mr. Woolf, and that the gunshot wounds sustained by both victims was the cause of each victim’s death.” (Woolfs brief, p. 103.)
The record demonstrates that, before trial, Woolf filed a motion in limine to exclude the introduction of the photographs based on, he said, “gruesomeness and depravity.” (R. 157.) The State indicated that, although it had around 200 photographs, it would “limit [them] greatly.” (R. 157.) The circuit court took the motion under submission, but, as the 13 individual photographs at issue were offered into evidence, Woolf raised objections that the circuit court overruled. “A trial court has wide discretion in determining whether to exclude or to admit evidence, and the trial court’s determination on the admissibility of evidence will not be reversed in the absence of an abuse of that discretion.” Woodward v. State, 123 So.3d 989, 1014 (Ala.Crim.App.2011).
We have held:
“ ‘Photographic evidence is admissible in a criminal prosecution if it tends to prove or disprove some disputed or material issue, to illustrate some relevant fact or evidence, or to corroborate or dispute other evidence in the case. Photographs that tend to shed light on, to strengthen, or to illustrate other testimony presented may be admitted into evidence. Chunn v. State, 339 So.2d 1100, 1102 (Ala.Cr.App.1976). To be admissible, the photographic material must be a true and accurate representation of the subject that it purports to represent. Mitchell v. State, 450 So.2d 181, 184 (Ala.Cr.App.1984). The admission of such evidence lies within the sound discretion of the trial court. Fletcher v. State, 291 Ala. 67, 277 So.2d 882, 883 (1973); Donahoo v. State, 505 So.2d 1067, 1071 (Ala.Cr.App.1986) (videotape evidence). Photographs illustrating crime scenes have been admitted into evidence, as have photographs of victims and their wounds. E.g., Hill v. State, 516 So.2d 876 (Ala.Cr.App.1987). Furthermore, photographs that show the external wounds of a deceased victim are admissible even though the evidence is gruesome and cumulative and relates to undisputed matters. E.g., Burton v. State, 521 So.2d 91 (Ala.Cr.App.1987). Finally, photographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors. Hutto v. State, 465 So.2d 1211, 1212 (Ala.Cr.App.1984).’ ”
Thompson v. State, 153 So.3d 84, 130 (Ala.Crim.App.2012) (quoting Ex parte Siebert, 555 So.2d 780, 783-84 (Ala.1989)).
In the instant case, although Woolf did not dispute that he had shot Angel and Ayden and that the gunshot wounds caused their deaths, the State was still required to prove those elements at trial. The circuit court did not abuse its discretion in admitting the photographs into evidence.
V.
Woolf contends that the evidence was insufficient to sustain his convictions. At the conclusion of the State’s case Woolf moved for a judgment of acquittal; he renewed this motion at the close of all the evidence. The circuit court denied each motion. As he similarly argued before the circuit court in support of his motions, Woolf specifically asserts that the “State failed to offer evidence that Mr. Woolf intended to kill his family at the time of the shootings, as required to sustain a conviction for capital murder.” (Woolfs brief, p. 100.) Because Woolf attacks the sufficiency of the evidence only on the basis that the State failed to prove intent, we address only that element of his convictions.
*374 “‘“In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution.’” Ballenger v. State, 720 So.2d 1033, 1034 (Ala.Crim.App.1998), quoting Faircloth v. State, 471 So.2d 485, 488 (Ala.Crim.App.1984), aff'd, 471 So.2d 493 (Ala. 1985). ‘“The test used in determining the sufficiency of evidence to sustain a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt.” ’ Nunn v. State, 697 So.2d 497, 498 (Ala.Crim.App. 1997), quoting O’Neal v. State, 602 So.2d 462, 464 (Ala.Crim.App.1992). ‘“When there is legal evidence from which the jury could, by fair inference, find the defendant guilty, the trial court should submit [the case] to the jury, and, in such a case, this court will not disturb the trial court’s decision,” ’ Farrior v, State, 728 So.2d 691, 696 (Ala.Crim.App. 1998), quoting Ward v. State, 557 So.2d 848, 850 (Ala.Crim.App.1990). ‘The role of appellate courts is not to say what the facts are. Our role ... is to judge whether the evidence is legally sufficient to allow submission of an issue for decision [by] the jury,’ Ex parte Bankston, 358 So.2d 1040, 1042 (Ala.1978).”
Gavin v. State, 891 So.2d 907, 974 (Ala. Crim.App.2003).
We have explained:
“Normally there is no direct evidence of intent. ‘“Intent, we know, being a state or condition of the mind, is rarely, if ever, susceptible of direct or positive proof, and must usually be inferred from the facts testified to by witnesses and the circumstances as developed by the
evidence.” ’ Ex parte C.G., 841 So.2d 292, 301 (Ala.2002), quoting Pumphrey v. State, 156 Ala. 103, 106, 47 So. 156, 157 (1908).”
Brown v. State, 11 So.3d 866, 914 (Ala. Crim.App.2007).
Accepting as true all the evidence offered by the State and according the State all legitimate inferences from that evidence, we conclude that a rational jury could have found Woolf guilty of both counts.
As we discuss in greater detail in Part IX of this opinion, the jury could have properly inferred intent from the use of the firearm. Additionally, when Woolf called emergency 911 after the shootings, he told the operator who answered that he had just killed his family and that he needed to go to jail.
Further, the testimony regarding Woolfs second trip to Resultz Corp. would also have allowed the jury to infer Woolfs intent in shooting Angel and Ayden. Woolf now argues that the “State’s argument [that Woolf began forming the intent to kill Angel and Ayden when he returned to Resultz to obtain an explanation of the results of the DNA testing] was both coun-terfactual and legally flawed, because the results of the paternity test showed that Mr. Woolf was Ayden’s biological father.” (Woolfs brief, p. 100.) Woolfs argument, however, misses the import of the testimony regarding his second trip to Resultz Corp. While at Resultz Corp. on that occasion, Woolf said that he wanted to have the DNA-testing results “explained] to him because he was a little confused about [them]” and that he was “very confused about the results.” (R. 1603.) Jacqueline Dukes, an employee of Resultz Corp., also testified “[t]hat for whatever reason people were questioning the paternity of the child.” (R. 1605.) Therefore, despite the results establishing that there was a *375 99.9999 percent probability that Woolf was Ayden’s biological father, Woolf was confused about the results and what people had been saying regarding Ayden’s paternity. Among other bases on which the jury could have inferred an intent to kill, the jury could have reasonably inferred that Woolfs confusion about the paternity results led him to form an intent to kill Angel and Ayden.
VI.
Woolf asserts that portions of the prosecutor’s guilt-phase closing argument were calculated to inflame the passions or prejudices of the jury.
‘When evaluating prosecutorial arguments, we keep in mind the following:
“ ‘ “The relevant question is whether the prosecutor’s comments ‘so infected the trial with unfairness as to make the resulting conviction a denial of due process.’” Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986), quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). Comments made by the prosecutor must be evaluated in the context of the whole trial. Duren v. State, 590 So.2d 360, 364 (Ala.Cr.App.1990), aff'd, 590 So.2d 369 (Ala.1991), cert. denied, 503 U.S. 974, 112 S.Ct. 1594, 118 L.Ed.2d 310 (1992).’ ”
Scott v. State, 163 So.3d 389, 453 (Ala.Crim.App.2012).
Woolf did not object to any of the statements on which he bases his claims on appeal; our review, therefore, is for plain error. See Rule 45A, Ala. R.App. P.
A.
Woolf complains that during rebuttal closing argument “the prosecution sought to arouse jurors’ personal hostility towards Mr. Woolf.” (Woolfs brief, p. 94.)
1.
Woolf first cites this comment as improper conduct on the part of the prosecutor:
“Here you have, ladies and gentlemen, when you cut through all the psychological excuses for bad behavior, you’ve got somebody with a real bad personality. You have a self-centered person who cannot get out of their own selves to think about anybody else.”
(R. 2170-71.)
Those comments, however, were directly preceded by this reference to the testimony of Woolfs psychologist:
“What about his psychiatrist’s testimony? He talked about the fact that [Woolf] has learning disabilities which many, many people in this world have learning disabilities. He talked about the fact that he has a substance abuse problem. He was diagnosed as bipolar at one point in time although he’d only seen him be depressed but you can get a bipolar diagnosis if you’ve had one manic episode in the past. And whatever medicine he took he chose to quit taking because it interfered with his sexual functioning. Bipolar, substance abuse, learning disability, antisocial borderline, borderline. I said, now, isn’t that something that you find a lot among criminal defendants, among criminals? And he kind of wanted to wiggle a little bit on that but Dr. Bennett finally said, well, yes. You do see that diagnosis more among criminals than you do among the general population. And why is that? It’s a perfect stew. It’s a perfect recipe of a personality disorder, not a mental disorder, not a mental disease, a personality. That is a trait of a person’s personality. And in this case [Woolfs] per *376 sonality was such that he has a tendency -to exaggerate a wide range of emotional symptoms. He shows signs of a tendency to act out. He accumulates tension and frustration and feels an overwhelming need to act in some way in order to relieve these. .He’s easily agitated and can engage in a good deal of obsessive thought. Which all of that fits exactly what culminated with the murder of his wife and the murder of his child.”
(R. 2169-70.)
When viewed in their proper context, the statements about which Woolf complains are a legitimate comment on the psychologist’s testimony.
2.
Woolf also complains that the prosecutor referred to- him as the “boogie man” and asked the jury to “[d]o justice for the monster who slaughtered his family.” (R. 2173; 2174)
“This Court has repeatedly held that the prosecutor may refer to an accused in unfavorable terms, so long as the evidence warrants the use of such terms.” McNair v. State, 653 So.2d 320, 341 (Ala.Crim.App. 1992). In Albarran v. State, 96 So.3d 131, 186 (Ala.Crim.App.2011), we quoted with approval the following from the Johnson v. Zant, 249 Ga. 812, 295 S.E.2d 63 (1982):
“This court has held that flight of oratory, figurative speech, and false logic are not error requiring reversal.... These may include closing argument by the district attorney characterizing a defendant as a ‘brute, beast, an animal and a mad dog who did not deserve to live.’ ”
Zant, 249 Ga. at 818, 295 S.E.2d at 69.
In the instant case, the evidence demonstrated that Woolf shot his two-year-old son and then shot his wife in the face. In light of the evidence presented, the prosecutor’s comments did not infect the trial with unfairness that denied Woolf due process.
B.
Woolf next argues that “the State argued the evidence regarding Mr. Woolfs domestic disturbances with his wife ... in a manner suggesting that because Mr. Woolf engaged in these acts he was more likely to have intended to kill his wife and son at the time of the shootings.” (Woolfs brief, pp. 95-96.)
During closing argument, the prosecutor stated:
“[Woolf said] everything was fine [with Angel]. There were no problems between us. She was just mad at me because I’d gone out that night. And so that’s why she’s going to come screaming out with a glass of coke in her hand while he’s got a gun in his hand and attack him. And his response to that, do you remember? He said, oh, yeah, we fussed and fought all the time. We liked to. So this is nothing unusual for him if that had happened, and it hadn’t, but if that was the case would that be logical that he’s going to so react to that that [sic] he’s going to take a gun and shoot it, shoot it into the floor of a perfectly good trailer, shoot a gun? None of this makes any sense whatsoever. You might say, well, this one thing looks odd or this one thing looks odd. But you start adding up so many and all of those things point to nothing but the guilt of [Woolf] and his intent to kill his wife and his intent to kill his child,”
(R. 2115-16.)
On both direct and cross-examination, Woolf testified that his relationship with Angel had been good after they received the paternity-test results. He also testified that, when he came home on the night of the incident, “Angel came out of the bedroom screaming where have I been at, *377 who I been with, why am I coming home so late.” (R. 1898.)
We have stated:
“The prosecution is entitled to ‘spotlight the defense’s strategy,’ and a prosecutor’s remarks during closing argument pointing out the flaws in the defense’s theory of the case do not constitute improper argument. ‘During closing argument, the prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference.’ Rutledge v. State, 523 So.2d 1087, 1100 (Ala.Crim. App.1987) (citation omitted), rev’d on other grounds, 523 So.2d 1118 (Ala. 1988). The remarks complained of by the appellant were part of the prosecutor’s legitimate argument that the evidence did not support the defense’s theory that the robbery of Johnson was a ‘mere afterthought.’ We find no error here, plain or otherwise.”
Reeves v. State, 807 So.2d 18, 45-46 (Ala. Crim.App.2000).
Here, when read in their proper context, the prosecutor’s comments were not a suggestion that the domestic-violence problems between Woolf and Angel made it more likely that he killed Angel and Ay-den. Rather, they were a comment on Woolfs trial testimony, and they do not constitute error, plain or otherwise.
C.
Woolf argues that “the prosecution appealed to the jurors’ sympathy for Angel and Ayden Woolf as grounds for why Mr. Woolf should be convicted.” (Woolfs brief, p. 97.) In support of this argument, he cites the following statement made during the prosecutor’s rebuttal closing argument:
“Who went first? Did he kill Angel first? Did he kill Ayden first? Did Angel have to have those few horrible moments when she saw her son shot, shot Ayden first. Did she reach for him? Did she go for him? Any mother would have if she’d seen that. She would have been all over him. Or did Ayden? Did Ayden have to see mama, mama be shot? Ayden knows what’s going on in this world. He’s two and a half but he’s got a brain. He knows what’s happening. He knew things were bad in his world, bad with his dad. Horrible whichever way it went.”
(R. 2118-19.)
We have “consistently held that appeals to jurors, asking them to imagine how a victim felt, do not rise to the level of plain error so long as those appeals are based on the evidence.” Wilson v. State, 142 So.3d 732, 773 (Ala.Crim.App.2010).
The prosecutor’s comments do not rise to the level of plain error.
VII.
Woolf argues that “[t]he trial court committed reversible error by failing to instruct the jury on the lesser included offenses of capital murder in violation of Beck v. Alabama, 447 U.S. 625 (1980).” (Woolfs brief, p. 19.) Because Woolf did not object to the circuit court’s instructions or the verdict forms used on this basis, our review is limited to plain error. See Rule 45A, Ala. R.App. P.
In Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), the United States Supreme Court explained that
“when the evidence unquestionably es- ' tablishes that the defendant is guilty of a serious, violent offense — but leaves some doubt with respect to an element that would justify conviction of a capital offense — the failure to give the jury the ‘third option’ of convicting on a lesser *378 included offense would seem inevitably to enhance the risk of an unwarranted conviction.”
Beck, 447 U.S. at 637.
“No defendant can be found guilty of a capital offense unless he had the intent to kill.... ” Ex parte Woodall, 730 So.2d 652, 657 (Ala.1998).
Count I of the indictment charged Woolf with capital murder for intentionally causing the deaths of Angel and Ayden by one act or pursuant to one scheme or course of conduct, see § 13A-5-40(a)(10), Ala.Code 1975. Woolf Ayas charged in count II with capital murder for intentionally causing the death of Ayden, who was less than 14 years of age, pursuant to § 13A-5-40(a)(15), Ala.Code 1975.
The circuit court worked extensively with trial counsel in an attempt to select the proper jury instructions and to fashion the verdict forms in order to avoid conflicting verdicts on the two counts.[5] The circuit court indicated that it was concerned with “the potential pitfalls of inconsistent or illegal yerdicts.” (R. 2073.) As the State summarized in its brief, “[t]he problem the court faced was how to present lesser- included offenses without creating the possibility of a verdict that was illegal or offended principles of double jeopardy.” (State’s brief, pp. 20-21.)
Woolf asserts that “[t]he trial court’s jury instructions on Count II omitted any reference to lesser-included offenses, neglecting even'the lesser-included offenses of reckless manslaughter and criminally negligent homicide.” (Woolfs brief, p. 24.) The record demonstrates, however, that the circuit court did instruct-the jury on lesser-included offenses regarding Ayden and presented those options on one of the two verdict forms used by the circuit court. The -first form consisted of two pages — which were stapled together — and related to count I of the indictment. (R. 2175.) The first page of that form gave the jury the option of finding Woolf guilty as charged in the first count of the indictment, That page also gave the jury the options of finding Woolf (1) guilty of the murder of Angel; (2) guilty of the reckless manslaughter of Angel; (3) guilty, of the heat-of-passion. manslaughter of Ángel; or (4) not.guilty as to count I. (C. 88.) The second page of the first form gave the jury the options of finding Woolf (1) guilty of the reckless manslaughter of Ayden; (2) guilty of the criminally negligent homicide of Ayden; or (3) not guilty. (C. 90.)
The verdict form for count II, which was separate from the two-page verdict form related to count I, gave the jury .the option of finding Woolf guilty or not guilty of the capital murder of Ayden.
In its instructions to the jury, the circuit court went into great detail explaining the verdict form for count I to the jury¡ • .As a part of that explanation, the circuit court specifically instructed the jury regarding the use of the two forms:
“This is count one. Just to make it a ■ little clearer, count one, is the two-page form. If your verdict is, for example, we, the jury, find the Defendant Michael Bragg Woolf, guilty of capital murder as charged in the indictment, you would put an ‘x’ before that we. And ... the foreperson would date it and sign it. That would conclude count one. And then you would go to the second page *379 not the second page, the second form. That’s all you would do. You wouldn’t go to the second page or anything. Let me explain it a little bit. Count one again, is the intentional murder of two or more people pursuant to a common scheme. It encompasses the intentional murder of two people. So you don’t have to consider, well, what about Ay-den, what about Angel? It says we have found him guilty of intentional murder of two or more persons. But you say, you know, judge, the lesser included, let’s go down there and look. All right. Let’s say you look at the lesser included. We, the jury, find the Defendant Michael Bragg Woolf, guilty of the lesser included offense of murder as to the death of Angel Woolf. Let me throw this out at you. Let’s say, the State under those instructions, the State hasn’t met its burden. We’re going to find murder as to the death of Angel Woolf. Let’s say that’s your verdict. Well, there’s an issue there because what does that leave us to do with Ay-den Woolf? Well,' let me tell you. You’re back really in the same boat. If you find intentional murder as to Angel Woolf, you’ve got to do something with Ayden Woolf. All right. If you find, however, that Ayden Woolfs death was not intentional murder, let me just throw this out. I’m just giving you an example. If you find you think that it was intentional murder of intentional murder of Angel but you think it was manslaughter as to Ayden, that then would not be .the intentional murder of two or more people pursuant to a common scheme because you’ve already said Ayden you think it was manslaughter. So what you do is go to page two. Let’s flip that. Then that is the lesser includ-eds as it applies to Ayden. Reckless manslaughter is the first one, criminally negligent homicide is the second one and not guilty is the third. Those are your options.. All right. Let me get to one that’s going to kind of throw you. If under the instructions I have given you on count, one you find the Defendant intentionally murdered Ayden Woolf who is a child less than fourteen but find the Defendant is guilty of one of the lesser included offenses regarding the death Angel Woolf, you should mark the front page of the verdict form as to one of the lesser includeds regarding Angel and consider nothing on the second page of that form but rather proceed to the single verdict form which is the verdict form for count two, .,. The reason we did it this way, there’s a possibility of what we call inconsistent verdicts. If you found that you think the State proved that the Defendant intentionally murdered Ayden Woolf but you don’t think they proved that he intentionally murdered Angel, then by law they haven’t proved count one of the indictment, the intentional murder of two or more people pursuant to a single course or act, because you found you don’t think that Angel was intentionally murdered. What you do then is you find if he’s guilty of a lesser included offense or not guilty you would mark the first page. We, the jury, find the Defendant, Michael Bragg Woolf, guilty of the lesser included offense of murder involving the . death of Angel Woolf or, we, the jury, find the Defendant, Michael Bragg Woolf, guilty of the lesser included offense of reckless manslaughter as to the death of Angel Woolf or, we, the jury, find the Defendant, Michael Bragg Woolf, guilty of the lesser included offense of heat of passion manslaughter as to the death of Angel Woolf or, we, the jury, find the Defendant not guilty. But if you found that the problem is you’ve already said you thought, under that line of thinking, that he intentionally mur *380 dered Ayden. Well, the intentional murder of a child less than 14 is capital. So count two is what? Count two, capital murder, murder of a victim less than fourteen years of age. That’s why this gets a little convoluted. I’m not telling you which ones to pick. But what I’m trying to instruct you on is that if you pick some it automatically precludes you from picking others and I think the way we’ve got it.”
(R. 2216-20.)
The jury, therefore, had the option of using the second page of the verdict form for count I to find Woolf guilty of the lesser-included offenses of reckless manslaughter or criminally negligent homicide regarding the death of Ayden and using the single-page verdict form for count II to find Woolf guilty or not guilty of the capital murder of Ayden. If the jury rejected the lesser-included offenses listed on the verdict form for count I and found Woolf guilty of intentionally killing Angel and Ayden, Woolf would by default have been guilty of count II because Ayden was younger than 14 years of age — a fact not contested by Woolfs defense. See § 13A-5-40(a)(15), Ala.Code 1975. Thus, contrary to Woolfs contention on appeal, the use of these forms did not prevent the jury from considering whether Woolf lacked the intent to kill Ayden.
In charging the jury on count I, the circuit court correctly stated that “[a] defendant commits an intentional murder of two or more persons, if ... he intends to kill each of those persons.” (R. 2189-90.) The trial court further instructed the jury that in order to find Woolf guilty as to count I, the State had to prove beyond a reasonable doubt that Woolf had intentionally caused the deaths of both Angel and Ayden. The circuit court explained reckless manslaughter and told the jury that “[tjhis lesser included offense applie[d] to both Angel Woolf and Ayden Woolf.” (R. 2196.) The trial court also instructed the jury on criminally negligent homicide, informing them that “[tjhis applies just to Ayden.” (R. 2201.)
In sum, as to Ayden’s death, the circuit court’s instructions gave the jury the options of finding Woolf guilty of capital murder, guilty of the lesser-included offenses of reckless manslaughter or criminally negligent homicide, or not guilty. Thus, the circuit court’s instructions were not inconsistent with Beck v. Alabama, supra, and, because the circuit court correctly instructed the jury on the lesser-included offenses, Woolf was not prejudiced. There was no error in the instructions on lesser-included offenses, plain or otherwise.
VIII.
Woolf asserts that the circuit court erred by failing to instruct the jury “that the absence of heat of passion is an element of the crime that the prosecution must prove beyond a reasonable doubt.” (Woolfs brief, p. 28.) Woolf contends that “he presented a heat of passion defense to the charge that he intentionally killed his wife, Angel Woolf.”
Woolf submitted a requested jury instruction asking that the circuit court instruct the jury that the “[tjhe Due Process Clause requires the prosecution to prove beyond a reasonable doubt the absence of the heat of passion on sudden provocation when the issue is properly presented in a homicide case.” (C. 243.) Although the circuit court charged the jury on heat-of-passion manslaughter and instructed it that the charge “only applie[d] to Angel Woolf,” it did not instruct the jury that the State was required to prove the absence of heat-of-passion. (R. 2198-99.) Woolf timely objected to the trial court’s refusal to give the requested instruction.
*381 Woolf argues that his “defense ... was predicated on the theory and the evidence that he shot his wife in a sudden heat of passion provoked by her assault on him during an argument that culminated in the shooting of his son.” (Woolfs brief, p. 34.) Woolf similarly argued before the circuit court that “[h]is perception was it was caused by his wife — he sees the assault on his child and as a result is moved by heat of passion to fire the gun at Angel Woolf.” (R. 2043.)
“ When reviewing a trial court’s jury instructions, we must view them as a whole, not in bits and pieces, and as a reasonable juror would have interpreted them.’ Johnson v. State, 820 So.2d 842, 874 (Ala.Crim.App.2000) (citing Ingram v. State, 779 So.2d 1225 (Ala.Crim.App. 1999)).
“ ‘A trial court has broad discretion when formulating its jury instructions. See Williams v. State, 611 So.2d 1119, 1123 (Ala.Cr.App.1992). When reviewing a trial court’s instructions, “ ‘the court’s charge must be taken as a whole, and the portions challenged are not to be isolated therefrom or taken out of context, but rather considered together.’ ” Self v. State, 620 So.2d 110, 113 (Ala.Cr.App.1992) (quoting Porter v. State, 520 So.2d 235, 237 (Ala.Cr.App.1987)); see also Beard v. State, 612 So.2d 1335 (Ala. Cr.App.1992); Alexander v. State, 601 So.2d 1130 (Ala.Cr.App.1992).’
“Williams v. State, 795 So.2d 753, 780 (Ala.Crim.App.1999).”
Albarran v. State, 96 So.3d 131, 186 (Ala. Crim.App.2011).
“In Ex parte McGriff, 908 So.2d [1024] at 1033-34, [ (Ala.2004),] the Alabama Supreme Court explained that once a defendant on trial for capital murder has ‘injected the issue of provoked heat of passion,’ the circuit court must instruct the jury that ‘“[t]o convict, the state must prove beyond a reasonable doubt [that] the defendant was not lawfully provoked to do the act which caused the death of the deceased by a sudden heat of passion.” ’ (quoting Alabama Pattern Jury Instructions — Criminal, pp. 6-8, emphasis omitted).
“Further, it is well settled that ‘ “[a] killing in sudden passion excited by sufficient provocation, without malice, is manslaughter.” ’ Roberson v. State, 217 Ala. 696, 699, 117 So. 412, 415 (1928) (quoting Vaughan v. State, 201 Ala. 472, 474, 78 So. 378, 380 (1918)). Specifically, § 13A-6-3(a)(2), Ala.Code 1975, provides that a person commits the crime of manslaughter if
“‘[h]e causes the death of another person under circumstances that would constitute [intentional murder]; except, that he causes the death due to a sudden heat of passion caused by provocation recognized by law, and before a reasonable time for the passion to cool and for reason to assert itself.’
“Although courts have reached different conclusions as to what constitutes adequate legal provocation, in Rogers v. State, 819 So.2d 643, 662 (Ala.Crim.App. 2001), this Court recognized the following three situations in which murder may be reduced to manslaughter on the basis that there existed legal provocation: ‘(1) when the accused witnesses his or her spouse in the act of adultery; (2) when the accused is assaulted or faced with an imminent assault on himself; and (3) when the accused witnesses an assault on a family member or close relative.’ See also Cox v. State, 500 So.2d 1296, 1298 (Ala.Crim.App.1986) (holding that ‘the mere appearance of imminent assault may be sufficient to arouse heat of passion’). Thus, once a *382 defendant has injected into the trial the issue of provocation related to one or more of those three situations, the defendant is entitled to have the circuit court instruct the jury that the State bears the burden of disproving- that the defendant acted out of the heat of passion brought about by adequate provocation. McGriff, 908 So.2d at 1033-34.”
Riggs v. State, 138 So.3d 1014, 1023-24 (Ala.Crim.App.2013).
In Mullaney v. Wilbur, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), a case on which the Alabama Supreme Court relied in Ex parte McGriff, supra, the United States Supreme Court explained that “the Due Process Clause requires the prosecution to prove beyond a reasonable doubt the absence of the heat of passion on sudden provocation when the issue is properly presented in a homicide case.” Mullaney, 421 U.S. at 704.
“In addition, ‘Provocation has been defined as that treatment by another which arouses anger or passion, which produces in the minds of persons ordinarily constituted the highest degree of exasperation, rage, anger, sudden resentment, or terror. Johnson v. State, 129 Wis. 146, 108 N.W. 55 (1906).’ Nelson v. State, 511 So.2d 225, 240 (Ala. Crim.App.1986), aff'd, 511 So.2d( 248 (Ala.1987), cert, denied, 486 U.S. 1017, 108 S.Ct. 1755, 100 L.Ed.2d 217 (1988).”
McDowell v. State, 740 So.2d 465, 468 (Ala. Crim.App.1998) (emphasis added).
In the instant case the issue of provocation was never “properly presented” by Woolf. Mullaney, 421 U.S. at 704. Woolfs argument on appeal is that he was entitled to a heat-of-passion-manslaughter charge based on evidence that, before he shot either Ayden or Angel, he and Angel argued and she grabbed his arm. Woolf testified that he shot Ayden when, while he was arguing with Angel and after she grabbed his arm, “[he] shot the gun towards — behind me and towards the floor to scare her.” (R. 1902.) When asked why he then shot “Angel at that point,” Woolf testified, “I don’t know.” (R. 1902.) During cross-examination Woolf was asked about whether his reaction to seeing Ay-den after he had been shot was “to turn around and shoot [his] wife” and Woolf replied, “Yeah, she was screaming at me.” (R. 1943.) Defense counsel, on re-direct, asked Woolf whether “the shooting of Angel [was done] in [the] heat of passion” and he replied, ‘Yeah.”[6] (R. 1959.)
Woolfs position is untenable and inconsistent with controlling caselaw. Although Rogers, supra, recognizes that a heat-of-passion-manslaughter charge is appropriate when an accused has witnessed an assault on a family member, we know of no authority that establishes that a defendant is entitled to such a charge when the defendant is the actor who committed the assault — indeed, such a principle would violate the definition of provocation, which includes “treatment by another” as discussed in McDowell, supra. We likewise know of no authority that suggests that a father who, in response to a mother’s grabbing of his arm during a heated argument, shoots his own child — accidently or otherwise — may then claim that his immediate shooting' of the mother presents a situation constituting adequate legal provocation in which a heat-of-passion-manslaughter charge would be warranted. As this Court stated in Biggs v. State, 441 So.2d 989 (Ala. Crim.App.1983): “To constitute adequate legal provocation, it must be of a nature calculated to influence the passions *383 of the ordinary, reasonable man.” 441 So.2d at 992. See also McDowell, 740 So.2d at 468 (“‘Provocation has been defined as that treatment by another which arouses anger or passion, which produces in the minds of persons ordinarily constituted the highest degree of exasperation, rage, anger, sudden resentment, or terror. Johnson v. State, 129 Wis. 146, 108 N.W. 65 (1906).’ Nelson v. State, 511 So.2d 225, 240 (Ala.Crim.App.1986)....” (additional citations omitted)).
Because there was no evidence of a recognized legal provocation before the shooting of Angel, no factual basis justified giving an instruction on heat-of-passion manslaughter as to Angel. Consequently, the circuit court’s error, if any, was in giving a heat-of-passion-manslaughter charge at all as to Angel — not in failing to give an instruction regarding the State’s burden of disproving the absence of heat-of-passion. Woolf is due no relief on this claim.
IX.
Woolf argues that the circuit court erred when it instructed the jury that intent could be inferred from the use of a deadly weapon while not instructing them that the jury had to consider all the circumstances of the shooting. Woolf specifically argues that the trial court’s instructions “created an unlawful presumption of specific intent to kill based solely on the use of a deadly weapon.” (Woolfs brief, p. 90.) Woolf did not object to the instruction of which he complains; therefore, our review is limited to plain error. See Rule 45A, Ala. R.App. P.
The circuit court provided the following instruction during the guilt phase of Woolfs trial:
“A person acts intentionally when it is his purpose to cause the death of another person. The intent to kill must be real and specific. Intent can be formed in an instant. It need not be preplanned or premeditated. There is no requirement in the law that the intent to kill be formed well in advance of committing a crime. The requisite intent may be formed immediately before a crime is committed. Intent can be inferred by the use of a firearm or other type of deadly weapon.”
(R. 2190-91.)
“It is well settled that an instruction that the jury may infer intent from the surrounding circumstances, like the instruction here, is permissible and proper. See, e.g., Ex parte Burgess, 827 So.2d 193, 199 (Ala.2000) (‘An instruction that “intent to commit murder may be presumed, from the defendant’s act of using a deadly weapon,” would unconstitutionally shift to the defendant the burden of proving lack of specific intent.... The correct instruction on this particular point would be that intent to kill may be inferred from the defendant’s act of using a deadly weapon.’); and McNabb v. State, 887 So.2d 929, 979 (Ala.Crim.App. 2001) (‘The court in this case correctly instructed the jury that the intent to kill could be inferred from the use of a deadly weapon; it did not impermissibly charge the jury that the intent to kill should be presumed from the use of a deadly weapon. Therefore, there was no error, much less plain error, in the trial court’s instruction.’), aff'd, 887 So.2d 998 (Ala.2004). See also Hart v. State, 612 So.2d 520, 528-29 (Ala.Crim.App.), aff'd, 612 So.2d 536 (Ala.1992); and DeRamus v. State, 565 So.2d 1167, 1170 (Ala.Crim.App.1990).”
Morton v. State, 154 So.3d 1065, 1084 (Ala. Crim.App.2013) (opinion on second application for rehearing).[7]
*384 The circuit court properly instructed the jury that it could infer intent from the use of a deadly weapon; the trial court did not impermissibly charge the jury that it had to presume intent. The instruction was not erroneous.
X.
Woolf argues that “[t]he trial court reversibly erred by coercing the jury to reach a verdict on count two that was consistent with its initial verdict on count one.” (Woolfs brief, p. 59.) Because Woolf raised no objection to the supplemental jury charge, our review is limited to plain error. See Rule 45A, Ala. R.App. P.
His argument is based on the following exchange that occurred between the circuit court and the jury foreman after the jury returned a verdict on only count one:
“THE COURT: All right. Y’all be seated. One thing I’m going to ask you. I’ve got your verdict form from you. I’ve got the verdict entered on the— involving count one. And you should have a verdict on count two because of the verdict you have on count one. Is there a reason that you can’t decide or you’re unclear?
“JUROR: No, sir. We just felt like, you know, and it may have been just been a miscommunication on us. We thought if we had the verdict on count one.
“THE COURT: Okay. I don’t want you to say too much but the verdict you entered on count two would allow you to enter a verdict — I’m sorry. The verdict you entered on count one would allow you to enter a verdict on count two. It wouldn’t result in inconsistent verdicts. So let me give that back to all. And just for the record, that would be [jury foreman’s name] who’s talking; correct?
“JUROR [jury foreman’s name]: Yes, sir. I’m sorry.
“THE COURT: That’s all right because of our seating chart.”
(R. 2249-50.)
Supplemental charges must be considered in the “whole context of its setting.” Daniels v. State, 416 So.2d 760, 762 (Ala.Crim.App.1982).
As discussed in Part VII of this opinion, the circuit court used two verdict forms. The first verdict form, which dealt with count I, consisted of two pages and allowed the jury to find Woolf guilty of capital murder, guilty of three lesser-included offenses regarding Angel, guilty of two lesser-included offenses regarding Ayden, or not guilty. The second form consisted of one page and gave the jury the opportunity to find Woolf guilty or not guilty of count II.
The record demonstrates that the trial court went to great lengths to accurately explain the use of the forms to the jury. In so doing, it informed the jury that, if it found Woolf guilty of count I, it should indicate so on the first page of the count I form and move on to the second form. The circuit court also informed the jury that if it found Woolf guilty of the intentional murder of Ayden but of a lesser-included offense involving Angel, it should appropriately mark the first form and move to the second form.
After being informed the jury had reached a verdict, the circuit court announced that, because of the “possibility of an inconsistent verdict,” “this [would be] *385 one of the times [it would] first get the verdict form and look at it and give it back to the foreperson to read.” (R. 2249.) The above-quoted exchange between the circuit court and jury demonstrates that the jury misunderstood the court’s instructions. The circuit court then merely instructed the jury that its verdict “on count one would allow [it] to enter a verdict on count two.” (R. 2250) (emphasis added.) Considered in context, the circuit court did not coerce a verdict on the second count; rather, it cleared up a misunderstanding the jury had regarding its instructions.

Penalty-Phase Issues

XI.
Woolf contends that Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), “invalidates critical aspects of Alabama’s capital sentencing scheme and renders his death sentence unconstitutional.” (Woolfs brief, p. 106.) Specifically, while acknowledging the Alabama Supreme Court’s decision in Ex parte Waldrop, 859 So.2d 1181 (Ala.2002), Woolf: (1) “disagrees with Waldrop’s holding that the Sixth Amendment does not require a jury to unanimously conclude that the aggravating circumstances outweigh the mitigating circumstances because the weighing process is a ‘moral’ judgment rather than a determination requiring a quantum of proof’; (2) argues that “Waldrop imper-missibly eases the State’s burden of proving that the death penalty is an appropriate punishment by holding that the jury need not be unaware that its culpability phase finding alone may authorize the trial judge to impose the death penalty in certain cases”; and (3) argues that Waldrop “undermines the reliability of the capital sentencing process and unfairly skews sentencing toward the imposition of the death penalty.” (Woolfs brief, pp. 106-08.)
In Waldrop, the Alabama Supreme Court explained:
“Ring and Apprendi [v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000),] do not require that the jury make every factual determination; instead, those cases require the jury to find beyond a reasonable doubt only those facts that result in ‘an increase in a defendant’s authorized punishment ... ’ or ‘ “expose[ ] [a defendant] to a greater punishment....”’ Ring, 536 U.S. at 602, 604, 122 S.Ct. at 2439, 2440 (quoting Apprendi, 530 U.S. at 494, 120 S.Ct. 2348). Alabama law requires the existence of only one aggravating circumstance in order for a defendant to be sentenced to death. Ala.Code 1975, § 13A-5-45(f). The jury in this case found the existence of that one aggravating circumstance: that the murders were committed while Waldrop was engaged in the commission of a robbery. At that point, Waldrop became ‘exposed’ to, or eligible for, the death penalty. The trial court’s subsequent determination that the murders were especially heinous, atrocious, or cruel is a factor that has application only in weighing the mitigating circumstances and the aggravating circumstances, a process that we held earlier is not an ‘element’ of the offense.”
Waldrop, 859 So.2d at 1190.
Although Woolf may disagree with Wal-drop, “‘[t]his Court has no authority to overrule Alabama Supreme Court precedent.’” Lane v. State, 169 So.3d 1076, 1135 (Ala.Crim.App.2013) (quoting Whatley v. State, 146 So.3d 437, 489 (Ala.Crim.App.2010) (opinion on return to remand)).
Because Alabama’s capital-sentencing ■process does not violate either Ring or Apprendi, Woolf is due no relief on this claim.
XII.
Woolf argues that “Alabama’s method of lethal injection constitutes cruel *386 and unusual punishment” in violation of the Eighth Amendment. (Woolfs brief, p. 108.) He specifically contends that “Alabama’s lethal injection has not been found to comply with the standards established by the United States Supreme Court in Baze v. Rees[, 553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008) ].” (Woolfs brief, pp. 108-09.)
We considered and rejected a similar argument in McCray v. State, 88 So.3d 1 (Ala.Crim.App.2010). There we noted that Alabama’s lethal-injection protocol was substantially similar to that of Kentucky, which was upheld by the United States Supreme Court in Baze v. Rees, supra. Woolfs claim is therefore without merit, and he is due no relief.
XIII.
Woolf asserts that he “is entitled to a new sentencing proceeding because, he says, the trial court failed to -consider uncontroverted mitigating evidence.” (Woolfs brief, p. 64.) Specifically, he claims the circuit court did not consider evidence- regarding his “family background, low intelligence, learning disabilities, documented mental disorders, and history of substance abuse.” (Woolfs brief, p. 75.)
Section 13A-5-47(d), Ala.Code 1975, requires a circuit court to
“enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in Section 13A-5-49, each mitigating circumstance enumerated in Section 13A-5-51, and any additional mitigating circumstances offered pursuant to Section 13A-5-52.”
Section 13A-5-52, Ala.Code 1975, provides:
“In addition to the mitigating circumstances specified in Section 13A-5-51, mitigating circumstances shall include any aspect of a defendant’s character or record and any of the circumstances of the offense that the defendant offers as a basis for a sentence of life imprisonment -without parole instead of death, and any other relevant mitigating circumstance which the defendant offers as a basis for a sentence of life imprisonment without parole instead of death.”
Under § 13A-5-45(g), Ala.Code 1975, “once [a disputed mitigating circumstance] is interjected the state shall have the burden of disproving the factual existence of that circumstance by a preponderance of the evidence.”
Lynn Tullos, Woolfs mother, testified during the sentencing phase of his trial. She stated that Woolfs “dad wasn’t a[n] emotional or responsive person ... [who] didn’t tell us, you know, that he loved us.” (R. 2335.) Tullos testified that she. did not believe that Woolf “got the love that he needed probably from his dad that [she] gave him.” (R. 2335.) She also said that Woolfs parents’ divorce, which occurred when he was about 10, “was very tough on him.” (R. 2335.) Tullos further testified that, after the divorce, she originally had custody of Woolf but that he moved “back and forth for a while” between her and his father, who eventually got custody of Woolf. (R. 2336.) While reviewing the mitigating circumstances at the sentencing hearing, Woolfs attorney reminded the circuit court of “the things from his mother” and “that all those things had a deep impact on him.” (R. 2416-17.)
' In its amended - sentencing order, the circuit court noted that it had “considered all statutorily enumerated mitigating circumstances as well as any non-statutory mitigating circumstances which might reasonably appertain.” (C. 79.) The circuit court listed each of the mitigating circumstances enumerated in § 13A-5-51, Ala. *387 Code 1975, and specifically found that none of those mitigating circumstances existed. (C. 79-81.)
The circuit court then noted that Woolf had “claimed either during trial or during the sentencing] hearing a number of non-statutory mitigating circumstances,” and proceeded to address those circumstances, (C. 81.) The circuit court noted that it had considered Woolfs history of alcohol and drug abuse and that it had considered testimony regarding Woolfs asserted learning disabilities, “a borderline personality disorder and [that Woolf] possibly is bi-polar,” as well as Woolfs having an intelligence quotient of 74. (C. 81.) The circuit court, acknowledging the sentencing hearing testimony of Woolfs mother, also stated:
“At the sentencing hearing on February 4, 2011, [Woolfs] mother Mrs. Lynn Tullos pleaded for her son’s life. From evidence presented during the trial it is apparent that Mrs. Tullos did everything she could for her son in order to make him a productive member of society. [Woolfs] actions rest solely on him and no one else. Blame and guilt cannot and should not be heaped upon [Woolfs] mother, his upbringing, or a learning disability. As human beings with free wills we are all responsible for our own acts and we must be held, accountable for them.”
(C. 71.)
Although the circuit court stated that it considered each of the above, the circuit court did not specifically state whether it found any of that evidence to be a nonstatutory mitigating circumstance. See Spencer v. State, 58 So.3d 215, 249 (Ala.Crim.App.2008) (“Thus, 'although it is apparent that the trial court considered the evidence Spencer offered as nonstatu-tory mitigating circumstances, it is not clear from the record whether the trial court found any of the evidence to actually constitute nonstatutory mitigation.”). Moreover, although the circuit court’s order briefly references Woolfs “upbringing;” this reference does not indicate whether the circuit court found the evidence of Woolf s family background to be a nonstatutory mitigating circumstance and if so, whether it considered that evidence wheri it weighed the aggravating and mitigating circumstances and the jury’s recommendation in its determination that death was the appropriate sentence in this case.
“ ‘ “As this Court stated in Roberts v. State, 735 So.2d 1244 (Ala.Crim.App. 1997), aff'd, 735 So.2d 1270 (Ala.1999):
“ ‘ “ ‘In capital cases, it is the duty of this court to independently determine whether the sentence of death is appropriate in a particular case. In order to reach this conclusion, we must reweigh the aggravating circumstances and the mitigating circumstances as found by the trial court,’
“ ‘ “735 So.2d at 1269 (emphasis added). See also Guthrie v. State, 689 So.2d 935 (Ala.Crim.App.1996), aff'd, 689 So.2d 951 (Ala.1997). Although ‘the trial court is not required to specify in its sentencing order each item of proposed nonstatutory mitigating evidence offered that it considered and found not to be mitigating,’ Williams v. State, 710 So.2d 1276, 1347 (Ala. Crim.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), in order for this Court to conduct its review of ’the death sentence, the trial court must specifically identify in its sentencing order those nonstatutory mitigating circumstances that it did find to exist.”
“‘[Morrow v. State,] 928 So.2d [315,] 326-27 [ (Ala.Crim.App.2004) ]. More recently, in Scott v. State, 937 So.2d 1065 (Ala.Crim.App.2005), this Court remand *388 ed the case for clarification of the sentencing order, noting in part:
“ ‘ “In a listing of mitigating circumstances the court found not to exist, the court included, ‘Any other mitigating circumstance offered pursuant to § 13A-5-52, Code of Alabama 1975.’ (C. 77.) In the next paragraph of the sentencing order, however, the court stated, ‘The Court considered the evidence presented by the defendant as evidence of non-statutory mitigating factors.’ (C. 77.) Although the trial court need not list and make findings as to each item of alleged nonstatuto-ry mitigating evidence offered by a defendant, Reeves v. State, 807 So.2d 18, 48 (Ala.Crim.App.2000), it must make a clear finding regarding the existence or nonexistence of nonstatu-tory mitigating evidence offered by a defendant. § 13A-5-47(d), Ala.Code 1975. The sentencing order is unclear as to whether the court found any nonstatutory mitigating circumstances to exist. On remand, this ambiguity must be clarified.”
“ ‘937 So.2d at 1087-88.’ ”
Spencer, 58 So.3d 215, 249-50 (Ala.Crim. App.2008) (quoting Woods v. State, 13 So.3d 1, 39-40 (Ala.Crim.App.2007)).
We therefore remand this case for the circuit court to amend its sentencing order to clarify its findings regarding the non-statutory mitigating circumstances. On remand, the circuit court should reweigh the aggravating and mitigating circumstances and resentence Woolf. The circuit court’s amended sentencing order shall be submitted to this Court within 42 days of the date of this opinion.
Because we are remanding this case for an amended sentencing order, this Court pretermits our requisite review pursuant to § 13A-5-53, Ala.Code 1975.

Conclusion

For the forgoing reasons, we affirm Woolfs capital-murder convictions, but we remand the case for an amended sentencing order consistent with this opinion.
AFFIRMED AS TO CONVICTION; REMANDED WITH INSTRUCTIONS AS TO SENTENCING.
WINDOM, P.J., and WELCH and BURKE, JJ., concur.
KELLUM, J., concurs in part and concurs in the result in part, with opinion.

. The results of the testing demonstrated that there was a 99,9999 percent chance that Woolf was Ayden’s father.

. Woolf was transferred because Cpl. Reeher’s car was equipped with ’TCOP,” an ahdio- and video-recording system. No recording from ICOP was introduced, during the trial.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. The "windows [in the patrol car] were part of the way down.” (R. 1414.)

. At one point, while discussing the construction of the verdict forms, the circuit court stated that "the problem is the lesser included as it involves Ayden on Count One, if [the jury] come[s] in with a lesser included, [it has] found as a matter or law it’s, not an intentional murder. Then how can in Count Two [it] find it’s an intentional murder?" (R. 2180.)

. No questions were asked of Woolf regarding his knowledge of legally recognized heat-of- ■ passion = defense before this question was asked and answered. ■

. The instruction in Morton was that the jury could “infer intent from the acts, behavior, and circumstances proven in evidence that the defendant committed at the time.” Morton, 154 So.3d at 1083.